**STATE of Kansas, et al., Appellants,**

v.

**UNITED STATES of America, et al.**

No. 92–5259.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 23, 1993.

Decided Feb. 18, 1994.

John W. Campbell, Deputy Attorney General for the State of Kansas, Topeka, KS, argued the cause for appellants, State of Kansas, et al. With him on the joint brief was Robert T. Stephan, Attorney General of the State of Kansas, Topeka, KS.

David J. Gallo, Special Assistant Attorney General of the State of Kansas, Topeka, KS, argued the cause for appellants, Wichita Airport Authority, et al.

Thomas Ray, Sr. Trial Atty., U.S. Dept. of Transp., Washington, DC, argued the cause, for appellees, U.S., et al. With him on the brief were Eric H. Holder, Jr., U.S. Atty., John D. Bates, R. Craig Lawrence, and John C. Martin, Assistant United States Attorneys, and Paul M. Geier, Asst. Gen. Counsel, U.S. Dept. of Transp., Washington, DC.

James T. Lenhart, Washington, DC, Attorney, argued the cause for appellee, Dallas–Fort Worth International Airport Board. With him on the brief were J.E. Murdock, III, Washington, DC, and W. Eric Pilsk, McLean, VA. Wanda G. Sobieski, Knoxville, TN, entered an appearance.

Richard A. Rothman, New York City, Attorney, argued the cause for appellee, American Airlines, Inc. With him on the brief were Mike McKool, Jr., Richard A. Lempert, Jeffrey R. Bragalone, Dallas, TX, David A. Schwarte, Fort Worth,. TX, and Holly J. Gregory, New York City. Eric W. Buether, Dallas, TX, entered an appearance.

Before: EDWARDS and SILBERMAN, Circuit Judges, and JAMES L. OAKES,* Senior Circuit Judge, United States Court of Appeals for the Second Circuit.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Appellants, who have brought a three-pronged constitutional challenge to the Wright Amendment, claiming that it violates the Port Preference Clause and the First Amendment, and interferes with their right to interstate travel, appeal the district court's grant of summary judgment on behalf of the government. We affirm.

## I.

The Wright Amendment, section 29 of the International Air Transportation Competition Act of 1979 (the International Competition Act), Pub.L. No. 96–192, 94 Stat. 35, 48–49 (1980),[1] restricts air traffic from Love Field,

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1988).

1. The Amendment, which is not published in the U.S.Code, reads as follows:

SEC. 29. (a) Except as provided in subsection (c), notwithstanding any other provision of law, neither the Secretary of Transportation, the Civil Aeronautics Board, nor any other officer or employee of the United States shall issue, reissue, amend, revise, or otherwise modify (either by action or inaction) any certificate or other authority to permit or otherwise authorize any person to provide the transportation of individuals, by air, as a common carrier for compensation or hire between Love Field, Texas, and one or more points outside the State of Texas, except (1) charter air transportation not to exceed ten flights per month, and (2) air transportation provided by commuter airlines operating aircraft with a passenger capacity of 56 passengers or less.

(b) Except as provided in subsections (a) and (c), notwithstanding any other provision of law, or any certificate or other authority heretofore or hereafter issued thereunder, no person shall provide or offer to provide the transportation of individuals, by air, for compensation or hire as a common carrier between Love Field, Texas, and one or more points outside the State of Texas, except that a person providing service to a point outside of Texas from Love Field on November 1, 1979, may continue to provide service to such point.

an airport located in the Dallas–Fort Worth area. Congress enacted the Amendment because it hoped to support "a fair and equitable settlement for a dispute that has raged in the Dallas/Fort Worth area for many years." H.R.CONF.REP.NO. 716, 96th Cong., 1st Sess. 24 (1979).

Prior to the enactment of the Amendment, the cities of Dallas and Fort Worth had constructed a new airport, Dallas–Fort Worth International Airport (DFW), which would handle all the area's air traffic. The cities agreed that existing airports, such as Love Field, which is about 5 miles from Dallas, would have their traffic rerouted to DFW (which is approximately 17 miles from Dallas—both distances measured as the crow flies from downtown). Though most airlines subsequently relocated to DFW, Southwest Airlines refused to leave Love Field and obtained a court ruling allowing it to continue to serve other cities in Texas. *City of Dallas v. Southwest Airlines Co.*, 371 F.Supp. 1015, 1035 (N.D.Tex.1973), *aff'd*, 494 F.2d 773 (5th Cir.), *cert. denied*, 419 U.S. 1079, 95 S.Ct. 668, 42 L.Ed.2d 674 (1974). After the passage of the Airline Deregulation Act of 1978, Pub.L. No. 95–504, 92 Stat. 1705 (1978), the Civil Aeronautics Board (CAB), as part of its airline deregulation policy, permitted Southwest to initiate Dallas–New Orleans service. *See Cramer v. Skinner*, 931 F.2d 1020, 1023 (5th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 298, 116 L.Ed.2d 242 (1991). Congress feared that if Southwest were to operate on an unrestricted basis from Love Field (closer to Dallas than DFW) many travelers to and from Dallas would choose that option rather than using DFW, thus undermining the economic viability of DFW. To protect the carriers flying into DFW and, therefore, the airport, Congress passed the Wright Amendment to limit the competitive impact of Love Field.

The Amendment forbids airlines from offering direct interstate flights from Love Field except: charter flights from Love not exceeding 10 flights per month, commuter airlines carrying less than 56 passengers, and flights to the contiguous states of Louisiana, New Mexico, Oklahoma, and Arkansas. International Competition Act § 29(a)–(c). In other words, Southwest may provide direct service between Love Field and points within Texas and the states bordering Texas (the Service Area).

Passengers may, under the Amendment, still fly between Love Field and points outside the Service Area. Rather than flying directly from Love Field to those destinations, however, passengers must first travel from Love Field to a point within the Service Area, change planes, and then continue on to their final destination. Travelers must purchase separate tickets for each leg of the trip (so-called "double-ticketing") and may not check their baggage for the entire journey. And, of course, the Wright Amendment puts no restrictions on service at DFW.

The Amendment further prohibits Southwest from "offer[ing] for sale" transportation outside the Service Area. International Competition Act § 29(c)(2). The Department of Transportation, which administers the statute, has interpreted that language as barring advertising or volunteering information regarding service between Love Field and points outside the Service Area. But if a traveler asks how he or she can fly through the Service Area to points outside, an airline may provide information regarding the double-ticketing arrangement. We have previously upheld the Department's interpretation of the Wright Amendment without reaching

(c) Subsections (a) and (b) shall not apply with respect to, and it is found consistent with the public convenience and necessity to authorize, transportation of individuals, by air, on a flight between Love Field, Texas, and one or more points within the States of Louisiana, Arkansas, Oklahoma, New Mexico, and Texas by an air carrier, if (1) such air carrier does not offer or provide any through service or ticketing with another air carrier or foreign air carrier, and (2) such air carrier does not offer for sale transportation to or from, and the flight or aircraft does not serve, any point which is outside any such State. Nothing in this subsection shall be construed to give authority not otherwise provided by law to the Secretary of Transportation, the Civil Aeronautics Board, any other officer or employee of the United States, or any other person.

(d) This section shall not take effect if enacted after the enactment of the Aviation Safety and Noise Abatement Act of 1979.
International Competition Act, § 29.

a First Amendment challenge. *See Continental Air Lines, Inc. v. Department of Transp.*, 843 F.2d 1444 (D.C.Cir.1988).

■ Appellants include the State of Kansas, one of its airports, the Central Travel Agency, the Wichita Airport Authority, and a number of travelers who wish to fly into Love Field from outside the Service Area without the inconvenience of a stopover in the Service Area. The travelers assert that their travel planning is burdened by the absence of published schedules and single through fares for flights to Love Field. The district court correctly determined that at least some of the individual appellants have standing to raise all of the challenges. *Kansas v. United States*, 797 F.Supp. 1042, 1048 (D.D.C.1992). The State of Kansas, the main litigant, may not sue on behalf of its citizens as *parens patriae, see id.* n. 10, citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 610 n. 16, 102 S.Ct. 3260, 3270 n. 16, 73 L.Ed.2d 995 (1982), but it has standing to sue as an employer whose employees occasionally fly to Dallas. That is not, however, because Southwest's fare structure is lower than competing airlines. Appellants do not dispute that that factor is quite independent of the Wright Amendment. It is merely because Love Field is closer to Dallas and therefore the trip presumably would take less time and cost Kansas somewhat less if its employees could use Love Field. The Central Travel Agency has standing to challenge those provisions of the Amendment that inhibit its employees from dispensing information concerning flights to and from Love Field.

A virtually identical lawsuit was brought a few years ago before the Fifth Circuit,[2] which rejected all three constitutional claims, *see Cramer v. Skinner*, 931 F.2d 1020 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 298, 116 L.Ed.2d 242 (1991), as did the district court in this case. *See* 797 F.Supp. at 1054.

**2.** That case was argued by Mr. David Gallo of San Diego, who also appeared before us as a "special" assistant attorney general of the State

## II.

### A. *The Port Preference Clause*

■ This provision of the Constitution has never been relied on by the federal judiciary to hold an act of Congress unconstitutional. The district court, accordingly, thought the clause "almost a historical nullity." 797 F.Supp. at 1049. We would prefer to say that it simply has not yet been seriously impinged upon. The Clause has two parts, both of which appellants assert have been transgressed by the Amendment. It states that: "No Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another: nor shall Vessels bound to, or from, one State, be obliged to enter, clear, or pay Duties in another." U.S. CONST. art. I, § 9, cl. 6.

Appellants claim that an airport is a "port" for purposes of the Clause and that the Wright Amendment, by permitting flights between Love Field and airports in service area states, discriminates against airports in non-service area states and thereby provides a "preference" to airports in service area states. Furthermore, to require passengers from, let us say, Wichita, bound for Love Field, to disembark in Oklahoma and change planes is to require those passengers and planes to "enter" or "clear" in Oklahoma before going on to Texas. The government does not dispute appellants' contentions that the Port Preference Clause covers airports and planes, so for purposes of the case, we assume that airports are "ports" and that airplanes are "vessels" within the meaning of the Clause.

The Port Preference Clause, as reflected in the records of the Philadelphia Convention, was designed to prevent the federal government from providing any regulatory benefits to ports in one state over another. The paradigm evil the Clause was explicitly designed to prevent is a federal law requiring ships sailing to Baltimore to first enter and clear at Norfolk. 2 RECORDS OF THE FEDERAL CONVENTION 417 (Max Farrand ed. 1966) (comments of Maryland delegates Daniel

of Kansas and as an attorney representing all other appellants.

Carroll and Luther Martin). The Framers obviously assumed that forcing entry or clearance in Norfolk would be a kind of tax imposed on vessels bound for the Chesapeake Bay; vessels would thereby have an incentive to reduce total expenses by delivering their cargo at Norfolk, thus reducing the volume of shipping traffic to ports in the Chesapeake.

Taking the second part of the Clause first, we consider appellants' argument that the Wright Amendment obliges planes from states outside the Service Area to "enter" or "clear" in service area states. The Government contends that the words enter and clear are technical terms that refer to imported goods. Thus, one meaning of enter is "to make report of (a ship or her cargo) at the customhouse." WEBSTER'S THIRD NEW INT'L DICTIONARY at 756. *See also United States v. Sullivan,* 26 F.2d 606, 608 (5th Cir.1928) ("A vessel does not make entry by arriving at a port."). And "clear" refers to "free[ing] (a ship or shipment) for passage by payment of custom duties or harbor fees." WEBSTER'S at 420; *see also Harrison v. Vose,* 50 U.S. (9 How.) 372, 380–81, 13 L.Ed. 179 (1850) ("a clearance cannot be produced unless the vessel has first entered at the custom-house"). We think the government is probably correct; the terms appear to have been used in the traditional commercial sense of clearing customs. Certainly that reading fits the purpose for which the Clause was designed.

In any event, whatever the precise meaning of the terms "enter" and "clear," we do not see how the Clause applies to the Wright Amendment because it cannot possibly be said that planes "bound" for Texas are obliged to enter an airport in "another" state when they take off from outside the Service Area. That is so because nothing in the Amendment prevents a plane leaving a nonservice area state from traveling directly to *anywhere else* in *Texas* before continuing on to Love Field. As such, the language of the second part of the Clause literally does not

apply to the Wright Amendment because it cannot be said that a "vessel bound to or from one state [is] obliged to enter ... in another."

Returning now to the Clause's first subclause, "[n]o preference shall be given by any regulation of Commerce or Revenue to ports of one state over those of another," we cannot quite conclude, as we did regarding the second part, that the words do not literally cover this situation. Still, the Wright Amendment is clearly not designed to provide a preference to ports of one *state* over another; it was drafted to protect DFW, one Texas airport, from competition from Love Field, another Texas airport (and to airline carriers who fly into DFW from competition from Southwest Airlines). Such a preference is of no concern to the Port Preference Clause which is designed to protect states, not individual ports. *See Pennsylvania v. The Wheeling & Belmont Bridge Co.,* 59 U.S. (18 How.) 421, 435, 15 L.Ed. 435 (1856).[3] Appellants argue, however, that airports in the service area states benefit because those airports can afford passengers the option of flying into Love Field directly while that advantage is not available to airports in states outside the Service Area and therefore the former are given a preference.

That advantage is of moment largely because of Southwest's lower fares, a factor quite independent of the Wright Amendment. Nevertheless, for travelers bound to Dallas, Love Field is somewhat closer than DFW, so we cannot say there is *no* benefit afforded those airports that can offer direct service to and from Love Field. The preference, such as it is, however, is rather insignificant— certainly as compared to the very substantial and undeniably legal preference bestowed on DFW as against Love Field. The Supreme Court, long ago, recognized that the Clause does not bar "incidental advantages that might possibly result from the legislation of Congress upon other subjects connected with commerce, and confessedly within its pow-

---

**3.** Luther Martin of Maryland did suggest, as another example of unconstitutional regulation, a requirement that all ships bound to Maryland enter Georgetown (rather than Chesapeake Bay Ports) but that would be, in truth, another device to favor Norfolk, Virginia because such ships would have to sail all the way up the Potomac to reach Georgetown. *See* Luther Martin, *The Genuine Information, in* 2 THE COMPLETE ANTI-FEDERALIST 63–64 (Herbert L. Storing ed. 1981).

ers." *Wheeling*, 59 U.S. at 439. *See Alabama Great Southern Ry. v. United States*, 340 U.S. 216, 229, 71 S.Ct. 264, 272, 95 L.Ed. 225 (1951), quoting *Louisiana Public Service Comm'n v. Texas & New Orleans R.R.*, 284 U.S. 125, 131, 52 S.Ct. 74, 76, 76 L.Ed. 201 (1931) (Congress may enact laws which " 'greatly benefit particular ports and which incidentally result to the disadvantage of other ports in the same or neighboring states' "). To be sure, in this case the legislation does not involve "other subjects"; the Wright Amendment speaks directly to a port preference, but it is certainly true that Congress' obvious purpose and the primary impact of the Amendment is to favor DFW over Love Field, not to favor airports in the Service Area over those in the non-Service Area. Under these circumstances, we do not believe the Port Preference Clause is offended.[4]

### B. *The Right to Interstate Travel*

■ That Americans enjoy a constitutional right to interstate travel was first recognized in *Crandall v. State of Nevada*, 73 U.S. (6 Wall.) 35, 18 L.Ed. 745 (1867). Nevada had imposed a tax on stagecoaches and railroads of $1.00 for all passengers transported out of Nevada—in effect treating the whole state as a toll road for through traffic. The majority of the Supreme Court, believing the tax not violative of the dormant commerce clause under existing precedent (two dissenters believed it was), thought the right of American citizens to travel interstate—for example, to petition their government in Washington—was inherent in our union. The court, relying on a prior dissenting opinion of Chief Justice Taney in *The Passenger Cases*, 48 U.S. (7 How.) 283, 492, 12 L.Ed. 702 (1849), observed that Americans had a right to travel. Once the court determined that the right existed, Nevada's tax, by analogy to *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 431, 4 L.Ed. 579 (1819) (the power to tax involves the power to destroy), was held unconstitutional. The Court observed:

> [I]t may be said that a tax of one dollar for passing through the State of Nevada, by stage coach or by railroad, cannot sensibly affect any function of the government, or deprive a citizen of any valuable right. But if the State can tax a railroad passenger one dollar, it can tax him one thousand dollars. If one State can do this, so can every other State. And thus one or more States ... may totally prevent or seriously burden all transportation of passengers. . . .

73 U.S. at 46. The federal courts have seldom again encountered either federal or state laws which directly burden interstate travel, but the right has been relied upon in recent years to condemn state laws that prefer long-time residents or penalize new residents thus indirectly implicating the right to travel. *See, e.g., Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (deprivation of voting rights); *Shapiro v. Thompson*, 394 U.S. 618, 629–31, 641–42, 89 S.Ct. 1322, 1328–30, 1335, 22 L.Ed.2d 600 (1969) (state imposed one year waiting period for new residents seeking welfare is unconstitutional, even with congressional authorization). When dealing with residency requirements, the Court has asked whether legislation involves a "classification which serves to penalize the exercise of that right." *Attorney General of New York v. Soto–Lopez*, 476 U.S. 898, 903, 106 S.Ct. 2317, 2321, 90 L.Ed.2d 899 (1986) (plurality opinion) (internal quotation omitted).

This case does not involve such a classification. If the right to travel is implicated, it can only be because "impeding travel is its primary objective" or "it actually deters ... travel." *Id.* at 903, 106 S.Ct. at 2321. The first proposition is easily rejected. The Wright Amendment is hardly *designed* to impede interstate travel; the whole purpose of the Amendment was to encourage interstate air travel to and from the Dallas–Fort Worth area, by channelling it through the newly built DFW airport. *See Cramer*, 931 F.2d at 1031. If the airport faced unrestrict-

---

**4.** The Fifth Circuit also reasoned that any preference afforded ports in the service area states was "an accident of geography." That logic was drawn from an earlier Fifth Circuit case, *City of Houston v. FAA*, 679 F.2d 1184, 1197 (5th Cir. 1982), dealing with restrictions on the total mileage flown by planes using National Airport in Washington, D.C. We are doubtful that the logic applies to this issue because all state boundaries can be termed an "accident of geography."

ed competition from Love Field, it was thought such competition would undermine DFW's economic vitality and decrease total travel to and from the Dallas region.

There remains the question, does the Amendment actually deter interstate travel? We suppose that all forms of economic regulation or taxation that are imposed on modes of interstate travel, whether airlines, railroads, or buses, including even gasoline taxes can be thought—at least in pure economic terms—to raise the cost and therefore deter interstate travel. Most of such burdens are placed on travel generally whether intrastate or interstate, but some are particularized to interstate travel. For instance, many toll roads, such as the Delaware Memorial Bridge, are designed primarily for interstate use. But, as Justice O'Connor observed in her dissenting opinion in *Soto–Lopez*, the plurality "implicitly recognize[d] ... [that] something more than a negligible or minimal impact on the right to travel is required before strict scrutiny is applied." 476 U.S. at 921, 106 S.Ct. at 2330–31. We think in this case that appellants' claim does not reach that threshold, and the impact of the Wright Amendment on interstate travel—even air travel to and from the Dallas–Fort Worth area—is negligible.

The parties with the greatest economic interest in encouraging interstate air travel are, of course, the airline carriers. None have joined appellants, and one of the largest carriers, American Airlines, intervened on the government's side. Admittedly, the larger carriers may well be motivated primarily to restrict Southwest's competition because of its lower price structure, but, as we have already observed, Southwest's lower fares are not to be attributed to the Wright Amendment. For that same reason, we must ignore the potential availability of lower Southwest fares for travelers who might wish to fly from Dallas to points outside the Service Area. The only relevant question is whether the Wright Amendment can be thought to deter interstate air travel to or from Dallas merely because Love Field is

somewhat closer to Dallas than is DFW. We suppose that, at least theoretically, there exist some putative Dallas passengers who forego interstate air travel to or from points outside the Service Area because the Wright Amendment makes it burdensome to fly into Love Field and the alternative, DFW, is a longer drive, but we doubt very much if such a person could actually be found. In short, we think the Amendment's interference with interstate travel to and from Texas or, to and from the Dallas–Fort Worth area, or even air travel to or from Dallas alone is trivial.[5]

## C. *First Amendment.*

■ The government argues initially that the First Amendment claim is not properly before us because appellants had not given the Department an opportunity to consider the issue. There is not much to this point since this case was brought initially in federal court, and it is hard to see when such an opportunity could have been afforded to the agency. Unlike *Continental Air Lines, Inc. v. Department of Transp.*, 843 F.2d 1444, 1455 (D.C.Cir.1988), which involved an appeal from agency orders and where we held that the First Amendment challenge should have been raised below, there are no administrative remedies to exhaust in this case.

■ As lawful "speech which does no more than propose a commercial transaction," *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 66, 103 S.Ct. 2875, 2880, 77 L.Ed.2d 469 (1983) (quotations omitted), so-called commercial speech, advertising of fares and service "may be restricted only if the government's interest in doing so is substantial, the restrictions directly advance the government's asserted interest, and the restrictions are no more extensive than necessary to serve that interest." *Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 340, 106 S.Ct. 2968, 2976, 92 L.Ed.2d 266 (1986) (citing *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980)).[6] The last two require-

---

5. The case is no different than if Love Field had been reserved entirely for intrastate carriage.

6. Appellants urge that the prohibition on advertising should be judged not on the *Central Hudson* standard for commercial speech, but with

ments are rather obviously satisfied in this case. The advertising ban advances the asserted governmental interest—to settle a regional dispute by preferring DFW over Love Field—only too well in appellants' eyes: The restrictions reduce the demand for Love Field and thereby strengthen DFW. *Cf. Posadas,* 478 U.S. at 341, 106 S.Ct. at 2976 (upholding ban that results in "the reduction of demand for casino gambling"). And the limited restriction meets the third criterion because it bears a "reasonable fit" to the interest asserted. *Board of Trustees v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 3034, 106 L.Ed.2d 388 (1989). A permissible regulation "employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective." *Id.* The Department's interpretation of the statute, while prohibiting advertising of service between Love Field and points outside the service area, permits airlines and their travel agents to provide service schedules and prices (to facilitate "double-ticketing" arrangements) to customers who specifically ask for them. The advertising ban thus is narrowly tailored to be " 'in proportion to the interest served.' " *Id.* (citation omitted).

That leaves appellants' strongest claim: The government's asserted interest is not sufficiently substantial to justify the ban on advertising. The argument is troubling not because we doubt Congress's intentions in enacting the Amendment, but because the constitutional test is so perplexing. Although the Court has from time to time declared certain asserted interests to be "substantial," *see Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n.,* 447 U.S. 557, 569, 100 S.Ct. 2343, 2353, 65 L.Ed.2d 341 (1980) ("fair and efficient" energy rates); *id.* at 568, 100 S.Ct. at 2352 ("energy conservation"); *Posadas,* 478 at 341, 106 S.Ct. at 2977 ("health, safety and welfare"); *Board of Trustees,* 492 U.S. at 475, 109 S.Ct. at 3032

("promoting an educational rather than commercial atmosphere on SUNY's campuses, promoting safety and security, preventing commercial exploitation of students, and preserving residential tranquility"), and others not to be, *see Carey v. Population Servs. Int'l,* 431 U.S. 678, 701, 97 S.Ct. 2010, 2024, 52 L.Ed.2d 675 (1977) (interest against "offensive and embarrassing" advertisements and against " 'legitimation' of illicit sexual behavior"), these decisions leave little insight as to what criteria the Court used to reach its conclusion. Indeed, the pedestrian nature of those interests affirmed as substantial calls into question whether *any* governmental interest—except those already found trivial by the Court—could fail to be substantial.

Appellants describe the governmental interest in this case as merely picking sides in an ongoing dispute between two cities and their airports—an interest too petty to warrant federal intervention in appellants' eyes, let alone restrictions that implicate the First Amendment. That expression of the government's interest is too narrow. If one instead characterizes the government's interest—as we think it should be stated—as ensuring adequate facilities for interstate air travel in the Dallas–Fort Worth area, it seems to us impossible to question its substantiality. *Cf. Northwest Airlines, Inc. v. Minnesota,* 322 U.S. 292, 303, 64 S.Ct. 950, 956, 88 L.Ed. 1283 (1944) (Jackson, J., concurring) (recognizing unique federal interest in regulating air travel). Appellants would have us look askance at the Wright Amendment as an undesirable interference with market forces. Whatever our personal views, we cannot so view the Amendment for purposes of constitutional analysis. We, therefore, agree with the Fifth Circuit which described the Wright Amendment as an effort to resolve "a controversy that has long hindered efforts to improve airline service for the Dallas–Fort

the allegedly "heightened scrutiny" reserved for prohibition of speech that promote a constitutionally protected activity, in this case interstate travel. *See Carey v. Population Servs. Int'l,* 431 U.S. 678, 701, 97 S.Ct. 2010, 2024, 52 L.Ed.2d 675 (1977); *Bigelow v. Virginia,* 421 U.S. 809, 822, 95 S.Ct. 2222, 2232, 44 L.Ed.2d 600 (1975). It is not clear how much those cases add to the *Central Hudson* standard. But, in any event,

appellants' attempt to bootstrap onto a higher level of scrutiny is fruitless. Our holding above that the Amendment does not violate the right to interstate travel would not change had Congress prohibited double-ticketing altogether. We therefore need not depart from *Central Hudson* since the advertising restrictions do not impinge on a constitutionally protected activity.

Worth area." *Cramer v. Skinner,* 931 F.2d 1020, 1034 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 298, 116 L.Ed.2d 242 (1991).

\*　\*　\*　\*　\*　\*

For the foregoing reasons, we affirm the judgment of the district court.

*So Ordered.*