# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 9, 2015          Decided July 7, 2015

No. 13-5263

MALLA POLLACK,
APPELLANT

v.

JAMES C. DUFF, DIRECTOR OF THE ADMINISTRATIVE OFFICE OF
THE UNITED STATES COURTS - IN HIS OFFICIAL CAPACITY, ET
AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-00866)

*Malla Pollack*, *pro se*, argued the cause and filed the briefs for appellant.

*John G. Interrante*, Assistant U.S. Attorney, argued the cause for appellees. With him on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: TATEL, *Circuit Judge*, and EDWARDS and GINSBURG, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

GINSBURG, *Senior Circuit Judge*: While residing in Kentucky, Malla Pollack applied for a job in Washington, D.C. with the Administrative Office of the United States Courts (AO), an agency of the federal judiciary. The AO's job announcement said it would consider an application from any present employee of the federal judiciary, nationwide, and from any non-employee who lived in the Washington metropolitan area, which includes the District of Columbia and parts of Maryland and Virginia. The AO rejected Pollack's application because she was neither an employee of the federal judiciary nor a resident of the Washington metropolitan area. Pollack then filed this suit against three officials of the AO, in their official capacities, claiming their refusal to consider her application violated her right to travel protected by the Constitution of the United States. The district court entered summary judgment for the defendants, which we now affirm.

## I. Background

In 2009 the AO posted online an announcement that it was seeking to hire an attorney-advisor to work in Washington, D.C. The vacancy announcement describing the position provided:

| | |
|---|---|
| **Who May Be Considered:** | Judiciary wide and All Sources — Washington Metropolitan Area |

In other words, the agency would consider an application from any employee of the federal judiciary, regardless where he or she lived, and from any person who lived in the Washington metropolitan area. Pollack applied for the job

even though she lived in Kentucky and did not work for the federal judiciary. The AO rejected her application because she did not "live or work within the announced area o[f] consideration" specified in the vacancy announcement.

Pollack sent a letter to the AO arguing the geographical limitation violated her constitutional right to travel because it discriminated against her based upon the state in which she resided. In response, the agency defended the constitutionality of the geographical limitation and advised Pollack that a rejected applicant's "only means of redress is to file a Fair Employment Practices System complaint." Pollack duly submitted to the AO an "official complaint of unconstitutional job discrimination," only to be told by the agency that it was "unable to accept [Pollack's] complaint because it d[id] not raise an issue that is covered by the AO's anti-discrimination policy," which is limited to "allegations of discrimination based upon race, color, religion, sex, national origin, age (at least 40 years of age), disability or the denial of a reasonable accommodation, or marital status."

After having been played upon in this way, Pollack sued three employees of the AO seeking a declaration that they had violated her constitutional right to travel and an injunction requiring them to consider her application and to refrain from using a geographical limitation in the future. The defendants filed a motion to dismiss the complaint on the ground it was barred by sovereign immunity or, in the alternative, for summary judgment. Pollack opposed the motion and asked the district court to direct the defendants to respond to her requests for discovery. The district court concluded the defendants were shielded by sovereign immunity and dismissed the complaint. *Pollack v. Duff*, 806 F. Supp. 2d 99, 103–05 (D.D.C. 2011). We reversed and remanded the case to the district court because "'suits for specific relief against

officers of the sovereign' allegedly acting 'beyond statutory authority or unconstitutionally' are not barred by sovereign immunity." *Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012) (quoting *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 689, 693 (1949)). We did not address the defendants' alternative arguments or the merits of Pollack's constitutional claim. *See id.* at 121.

On remand the district court considered the merits arguments previously presented by the parties, denied Pollack's motion for discovery, and entered summary judgment for the defendants on the ground that the geographical limitation did not violate Pollack's right to travel. *Pollack v. Duff*, 958 F. Supp. 2d 280, 287–93 (D.D.C. 2013).

## II. Analysis

Pollack contends the district court erred by concluding the defendants did not violate her constitutional right to travel and by entering summary judgment without first directing the defendants to respond to her requests for discovery. Before turning to the merits of Pollack's claim, we must consider the defendants' argument that we lack jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

## A. Judicial review

The defendants assert we lack jurisdiction because the AO's internal process for resolving disputes — its Fair Employment Practices System (FEPS) — is the exclusive means for deciding a claim that the AO unlawfully discriminated against an applicant for employment. In 1990 the Congress instructed the AO to "promulgate regulations providing procedures for resolving complaints of

discrimination by employees and applicants for employment." Administrative Office of the United States Courts Personnel Act, Pub. L. No. 101-474 § 3(a)(9), 104 Stat. 1097, 1098, codified at 28 U.S.C. § 602, Note. The AO accordingly created the FEPS, which "applies to all employees [and] applicants for employment." The accompanying manual provides "[e]mployees who believe they have been discriminated against on [a prohibited ground] … may seek resolution of such claims through the procedures of this System." Those procedures culminate in a decision by the Director of the AO, which "is final and may not be appealed or reviewed."

We need not consider whether we are precluded from reviewing a decision by the Director of the AO because — as the AO itself maintains — the FEPS does not apply to Pollack's claim the AO discriminated against her on the basis that she did not reside in the Washington, D.C. area. The FEPS applies only to claims of discrimination on the basis of specific invidious criteria. Indeed, when Pollack attempted to file a complaint based upon the denial of her constitutional right to travel, the agency informed her it was "unable to accept" her "official complaint of unconstitutional job discrimination" because "it d[id] not raise an issue that is covered by the AO's anti-discrimination policy." Although the FEPS provides that a decision by the Director of the AO may not be "appealed or reviewed," it does not purport to preclude judicial review of a claim that is not subject to the FEPS.

B. Constitutional right to travel

Satisfied that we have jurisdiction over this suit, we turn to Pollack's claim the AO violated her constitutional right to travel by rejecting her application because she did not live in

the Washington metropolitan area. Pollack acknowledges that the AO may require its employees to live near its office, which is in Washington, but she argues the Constitution prohibits the agency from rejecting an applicant because she does not live in a particular area at the time she submits her application.

As Pollack points out, the constitutional right to travel is "multifaceted" — and perhaps "misleadingly named" — because it protects several distinct interests. Appellant's Br. at 7. In its most recent explanation of the scope of the right, the Supreme Court observed that "[t]he 'right to travel' discussed in [its] cases embraces at least three different components" located in different provisions of the Constitution. *Saenz v. Roe*, 526 U.S. 489, 500 (1999).[*] Identifying the relevant source of the right as it is invoked in a particular case is essential because the Court has developed different doctrines to analyze the constitutionality of governmental action under each of the various provisions of the Constitution that protect the right to travel.

Neither the Supreme Court nor this court has previously considered whether the right to travel is implicated when a federal agency seeking to hire an employee limits the applicant pool to residents of a particular area. We will therefore address both the constitutional provisions invoked by Pollack, *viz.*, the Privileges and Immunities Clause of Article IV and the equal protection component of the Due Process Clause of the Fifth Amendment, as well as her claim of a right inherent in the structure of the Constitution.

---

[*] Indeed "[v]arious Justices at various times have suggested no fewer than seven different sources" of the right to travel in the text and structure of the Constitution. *Lutz v. City of York*, 899 F.2d 255, 260 (3d Cir. 1990).

1. Privileges and immunities

Pollack first argues the AO's geographical limitation violates the right to travel protected by Article IV, § 2, clause 1 of the Constitution, which provides: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." This clause "was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy" there. *Toomer v. Witsell*, 334 U.S. 385, 395 (1948). The Supreme Court has accordingly relied upon the Privileges and Immunities Clause to invalidate state laws that favor residents over nonresidents. In *Toomer*, for example, the Court held unconstitutional a South Carolina statute that required a nonresident to pay 100 times as much as a resident for a license to harvest shrimp in the waters of that state. *Id.* at 389, 395–403. Applying the same logic, the Court invalidated an Alaska law that required oil and gas companies operating in the state to give residents a preference in hiring. *See Hicklin v. Orbeck*, 437 U.S. 518, 520, 523–31 (1978). The Court has also held a state violates the clause when it refuses to admit a nonresident attorney to the bar upon the same terms as it would an attorney who resides in the state. *See Supreme Court of Va. v. Friedman*, 487 U.S. 59, 62, 64–70 (1988); *Supreme Court of N.H. v. Piper*, 470 U.S. 274, 276, 279–87 (1985).

The Court has developed a "two-step inquiry" to determine whether "a citizenship or residency classification" violates the Privileges and Immunities Clause. *Friedman*, 487 U.S. at 64. First, the classification must burden an activity that is "sufficiently basic to the livelihood of the Nation" because "[o]nly with respect to those 'privileges' and 'immunities' bearing upon the vitality of the Nation as a single entity must the State treat all citizens, resident and nonresident, equally." *Baldwin v. Fish & Game Comm'n of*

*Mont.*, 436 U.S. 371, 388, 383 (1978). Second, "if the challenged restriction deprives nonresidents of a protected privilege," then the Court will invalidate the restriction if it "is not closely related to the advancement of a substantial state interest." *Friedman*, 487 U.S. at 65.

Pollack urges us to apply this two-part test to the geographical limitation used by the AO. The test is self-evidently inapplicable, however, because Pollack challenges the action of an agency of the federal government, not that of a state. As the defendants point out, neither the Supreme Court nor this court has ever held an action taken by any branch of the federal government is subject to scrutiny under the Privileges and Immunities Clause of Article IV. To the contrary, we have thrice stated broadly that the Privileges and Immunities Clause of Article IV "is a limitation upon the powers of the states." *Duehay v. Acacia Mutual Life Ins. Co.*, 105 F.2d 768, 775 (D.C. Cir. 1939); *see also Banner v. United States*, 428 F.3d 303, 308 (D.C. Cir. 2005); *Neild v. District of Columbia*, 110 F.2d 246, 249 n.3 (D.C. Cir. 1940). This case admittedly differs from *Banner*, *Neild*, and *Duehay* in two arguably important respects. First, Pollack challenges a hiring practice adopted by an agency of the federal judiciary, whereas those cases concerned acts of the Congress. Second, the geographical limitation here at issue adversely affects residents of the states, whereas the laws at issue in our earlier cases adversely affected residents of the District of Columbia, over which the Congress has plenary authority. *See* U.S. Const. art. I, § 8, cl. 1. These differences are immaterial, however, because we conclude the Privileges and Immunities Clause of Article IV does not constrain the powers of the federal government at all.

The Supreme Court has consistently explained the clause restricts the authority of the states without ever so much as

implying it might also apply to the federal government. *See, e.g.*, *Baldwin*, 436 U.S. at 383 (observing the clause "has been interpreted to prevent a State from imposing unreasonable burdens on citizens of other States"); *Hicklin*, 437 U.S. at 523–24 (explaining the clause "'establishes a norm of comity' that is to prevail among the States with respect to their treatment of each other's residents" (quoting *Austin*, 420 U.S. at 660)).

Other circuits have held expressly that the clause does not apply to the federal government under a range of circumstances. *See Nehme v. INS*, 252 F.3d 415, 430 n.18 (5th Cir. 2001) ("[T]he Privileges and Immunities Clause [of Article IV] protects citizens of one state from abuses by other states, and does not address powers, such as the granting of citizenship, of the federal government"); *Cramer v. Skinner*, 931 F.2d 1020, 1029 n.7 (5th Cir. 1991) ("While we have held that state legislation may violate the privileges and immunities clause of article IV if it unjustifiably denies the right to travel, that clause applies only to state legislation and does not govern federal statutes"); *Nevada v. Watkins*, 914 F.2d 1545, 1555 (9th Cir. 1990) ("[T]he Privileges and Immunities Clause [of Article IV] has been construed as a limitation on the powers of the States, not on the powers of the federal government"); *Hawes v. Club Ecuestre El Comandante*, 535 F.3d 140, 145 (1st Cir. 1976) ("Article IV, § 2 is a limitation on powers of states and in no way affects the powers of a federal district court").

Pollack argues the courts' contemporary understanding of Article IV, § 2 is inconsistent with the original meaning of that provision. She cites a statement by James Iredell, a Federalist delegate to the first of the two ratifying conventions held in North Carolina, as evidence that the founding generation read the clause as a limitation upon the powers of

the federal government. The passage referenced by Pollack appears in a pamphlet Iredell wrote in response to objections raised by George Mason, a Virginia delegate to the Constitutional Convention who refused to sign the Constitution. Mason was concerned that "the Congress may grant monopolies in trade and commerce," to which Iredell replied:

> Upon examining the constitution I find it expressly provided, "That no preference shall be given to the ports of one State over those of another;" and that "citizens of each State shall be entitled to all privileges and immunities of citizens in the several States." These provisions appear to me to be calculated for the very purpose Mr. Mason wishes to secure. Can they be consistent with any monopoly in trade and commerce? … [The Anti-Federalists of Virginia] fear, that a majority of the States may establish regulations of commerce which will give great advantage to the carrying trade of America, and be a means of encouraging New England vessels rather than Old England. Be it so. No regulations can give such advantage to New England vessels, which will not be enjoyed by all other American vessels, and many States can build as well as New England, though not at present perhaps in equal proportion.

James Iredell, *Answers to Mr. Mason's Objections to the New Constitution, Recommended By the Late Convention* (1788), *reprinted in* Pamphlets on the Constitution of the United States 333, 356–58 (Paul Leicester Ford ed., 1968). Pollack reads Iredell's statement as positing that the Privileges and Immunities Clause forbids the federal government from favoring the residents of some states over the residents of others. It seems equally or more likely, however, that Iredell

referred to the Privileges and Immunities Clause for the proposition that a state may not deprive nonresidents of the "advantages" it extends to its own residents. Before quoting the Privileges and Immunities Clause, Iredell quoted the Port Preference Clause, which limits the powers of the federal government. *See Kansas v. United States*, 16 F.3d 436, 439 (D.C. Cir. 1994). Iredell seems first to have cited the Port Preference Clause to show the Constitution would prohibit the federal government from enacting laws favoring the shipping interests of one state over those of another and then cited the Privileges and Immunities Clause to show the Constitution also would prohibit the states from enacting such laws.

To be sure, it is also possible, as Pollack argues, to read Iredell's statement as a claim that the Privileges and Immunities Clause limits the powers of the federal government. To the extent Iredell's pamphlet reflects this view, it is relevant evidence of how a reasonable person might have understood the clause when the Constitution was ratified. Or, as the defendants put it, Pollack's pamphlet is "a guide to understanding the original meaning" of the Constitution, but not a source of "rights not explicitly found in the text." Appellees' Br. at 27; *see Noel Canning v. NLRB*, 705 F.3d 490, 500 (D.C. Cir. 2013), *aff'd on other grounds*, 134 S. Ct. 2550 (2014) ("When interpreting a constitutional provision, we must look to the natural meaning of the text as it would have been understood at the time of the ratification of the Constitution").

The defendants also caution that Iredell's statement is subject to the caveat that the views expressed by either a proponent or an opponent of ratification are not necessarily indicative of how a reasonable person would have understood the text of the document. As the defendants point out, some essays authored by both Federalists and Anti-Federalists were

designed to bring skeptics around to the author's position and do not necessarily reflect the common understanding of the meaning of the text of the Constitution. *See* John F. Manning, *Textualism and the Role of The Federalist in Constitutional Adjudication*, 66 Geo. Wash. L. Rev. 1337, 1358–61 (1998). The defendants' point is well taken. We note, for example, that in 1788, when Iredell authored the pamphlet Pollack quotes, he also published notes from the ratifying convention in North Carolina. The historical record shows "[v]arious Federalist speakers tinkered with" the notes from that convention before Iredell published them, so they would "serve as Federalist campaign literature," not as an accurate account of the views expressed at the convention. James H. Huston, *The Creation of the Constitution: The Integrity of the Documentary Record*, 65 Tex. L. Rev. 1, 24 (1986).

Looking beyond Iredell's statement, we find that neither the Founders nor the commentators of the period left many clues about how Article IV, § 2 was understood. *See* Stewart Jay, *Origins of the Privileges and Immunities of State Citizenship under Article IV*, 45 Loy. U. Chi. L.J. 1, 15 (2013) ("There was almost no recorded debate about the Privileges and Immunities Clause at the Convention"); Kurt T. Lash, *The Origins of the Privileges or Immunities Clause, Part I: "Privileges and Immunities" as an Antebellum Term of Art*, 98 Geo. L.J. 1241, 1259 n.97 (2010) ("James Madison described the Article as simply clearing up some of the ambiguous language of the Articles of Confederation. In the first constitutional treatise, St. George Tucker had little to say about the clause …." (citation omitted)). Charles Pinckney, who drafted the clause, reported it was "formed exactly upon the principles of the 4th article" of the Articles of Confederation, which had provided:

> The better to secure and perpetuate mutual friendship and intercourse among the people of the different States in this Union, the free inhabitants of each of these States, paupers, vagabonds and fugitives from justice excepted, shall be entitled to all privileges and immunities of free citizens in the several States; and the people of each State shall have free ingress and regress to and from any other State, and shall enjoy therein all the privileges of trade and commerce, subject to the same duties, impositions and restrictions as the inhabitants thereof respectively.

3 The Records of the Federal Convention of 1787 112 (Max Farrand ed., 1966). Like the corresponding clause in the Constitution, the Fourth Article of Confederation did not expressly state whether it limited the powers of the federal government as well as those of the states. In *Austin* the Supreme Court explained the Fourth Article of Confederation was intended to curb "the practice of some States denying to outlanders the treatment that its citizens demanded for themselves," which suggests it was viewed as a limitation upon the states alone. 420 U.S. at 660.

We find more definitive guidance in cases decided by the state and federal courts soon after ratification of the Constitution. *See Noel Canning*, 705 F.3d at 501 ("The interpretation of the Clause in the years immediately following the Constitution's ratification is the most instructive historical analysis in discerning the original meaning … because it reflects the 'public understanding' of the text" (quoting *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008))). Several interpretations of the clause are evident in the early cases and commentary. *See* Lash, 98 Geo. L.J. at 1259–60. As Pollack points out, at least two state courts held it prevented the federal government from discriminating on

the basis of state citizenship. *See Douglass v. Stephens*, 1 Del. Ch. 465, 477 (1821) (holding the Privileges and Immunities Clause was "designed to restrict the powers of Congress as to legislation, so that no privilege or immunity should be granted by it to one citizen of the United States, but such as might be common to all"); *Kincaid v. Francis*, 3 Tenn. 49, 53 (1812) (White, J. concurring) ("It seems to us most probable that [the Privileges and Immunities Clause] was intended to compel the general government to extend the same privileges and immunities to the citizens of every State, and not to permit that government to grant privileges or immunities to citizens of some of the States and withhold them from those of others").

The view advanced by these courts was not widely shared, however. The "vast majority of cases decided in this early period of the Republic" concluded the clause limits the extent to which a state may discriminate against nonresidents but it does not apply to the federal government. Lash, 98 Geo. L.J. at 1262 n.108; *see, e.g*, *Livingston v. Van Ingen*, 9 Johns. 507, 577 (N.Y. 1812) (Chancellor Kent, concurring) ("The provision that the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states … means only that citizens of other states shall have equal rights with our own citizens …. This is a very clear proposition, and the provision itself was taken from the articles of the confederation."); *Campbell v. Morris*, 3 H. & McH. 535, 548 (Md. 1797) ("When the new constitution was formed … there was reason to fear that particular states might not allow the citizens of other states the same privileges enjoyed by their own citizens; and had a provision securing them been omitted in the constitution, they might have been deprived of them"). The interpretation of the Privileges and Immunities Clause that "came to dominate case law and scholarly commentary from the Founding until

Reconstruction" — and that is still evident in the Supreme Court's more recent jurisprudence — provides the clause merely "require[s] states to grant visiting citizens some of the same privileges and immunities that the state conferred upon its own citizens."  Lash, 98 Geo. L.J. at 1260.

Finally, the location of the Privileges and Immunities Clause in § 2 of Article IV supports the conclusion that it is directed at the states and not at the national government.  Article IV is the "so-called States' Relations Article."  *Baldwin*, 436 U.S. at 379.  Section 2 of Article IV, in addition to the Privileges and Immunities Clause, included the Interstate Rendition Clause and the Fugitive Slave Clause, both of which were concerned with comity among the states.  *See California v. Superior Court of Cal., San Bernardino Cnty.*, 482 U.S. 400, 405 (1987) (describing the Interstate Rendition Clause as one example of a "limit[] on the sovereign powers of the States" that was "part of the Framers' conception of national identity and Union").  If the Privileges and Immunities Clause applied to the federal government, then we might expect to find it in Article I, § 9, alongside other limitations upon the powers of the Congress to discriminate against residents of certain states, such as the Export Taxation Clause and the Port Preference Clause; in any case, it would not be in Article IV.

Although the historical record is not pellucid, we think the weight of the evidence indicates the Privileges and Immunities Clause was not originally understood as a limitation upon the authority of the federal government.  We agree with the defendants, therefore, that the geographical limitation in the AO's hiring process is not subject to scrutiny under that clause.  Accordingly, we need not consider the defendants' further arguments that the opportunity to apply for a job with the AO is not a "privilege" protected by the

clause and that the geographical limitation is "closely related to the advancement of a substantial [government] interest." *Friedman*, 487 U.S. at 65.

2.  Equal protection

Pollack next contends the defendants lack a rational basis for discriminating against applicants who do not reside in the Washington metropolitan area. This argument invokes a separate line of cases, one that uses equal protection analysis to evaluate laws that burden the right to travel. *See, e.g.*, *Zobel v. Williams*, 457 U.S. 55, 60 n.6 (1982) ("In reality, right to travel analysis refers to little more than a particular application of equal protection analysis"). Unlike the Privileges and Immunities Clause, the principle of equal protection indisputably applies to the federal government as well as to the states. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995) (explaining the Court "treat[s] the equal protection obligations imposed by the Fifth and the Fourteenth Amendments as indistinguishable"); *see also Califano v. Torres*, 435 U.S. 1, 2–3 (1978) (evaluating whether a federal law that distinguished between residents of a state and residents of Puerto Rico implicated the right to travel); *Shapiro v. Thompson*, 394 U.S. 618, 623–25 (1969) (holding a federal law that applied to residents of the District of Columbia violated the right to travel).

The defendants argue we need not scrutinize the geographical limitation under the equal protection principle because it does not actually burden Pollack's right to travel. The Supreme Court has explained that a "law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right." *Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898,

903 (1986) (plurality) (internal quotation marks and citations omitted); *see also Kansas v. United States*, 16 F.3d at 441. Pollack does not argue impeding travel is the "primary objective" of the AO's geographical limitation. We will therefore limit our inquiry to whether the geographical limitation either deterred Pollack from traveling or created a classification that penalized her exercise of the right to travel.

First, Pollack asserts the geographical limitation deterred her from traveling because, although she is "willing and able to relocate" if she obtains a suitable job offer, moving to Washington "before obtaining a promise of employment … would be a major burden." If the AO had reviewed her application, then it might have offered her a job, which might have prompted her to move to the Washington area. Thus, Pollack might have been marginally more likely to travel to the Washington area but for the geographical limitation she is challenging. This effect upon Pollack's willingness to travel, *i.e.*, to exercise her right to travel, is "negligible" and does not warrant scrutiny under the Constitution. *Kansas v. United States*, 16 F.3d at 442. In the cited case we rejected a challenge to a federal law that prohibited certain interstate flights from landing at Love Field in Dallas instead of the nearby Dallas-Fort Worth International Airport. The plaintiffs argued the law deterred interstate travel because some travelers preferred flights that landed at Love Field. We observed that there might be some "putative Dallas passengers who forego interstate air travel" because they find it more "burdensome" to arrive at Dallas-Fort Worth International than at Love Field, but we concluded the interference with the right to travel was "trivial." *Id*. A law does not "actually deter" travel merely because it makes it somewhat less attractive for a person to travel interstate. *See Town of Southold v. Town of East Hampton*, 477 F.3d 38, 54 (2d Cir. 2007) ("[M]inor restrictions on travel simply do not

amount to the denial of a fundamental right" (quotation marks omitted)); *Miller v. Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999); *Cramer*, 931 F.2d at 1031.

Second, Pollack contends the AO's geographical limitation on hiring creates a "classification which serves to penalize the exercise of th[e] right" to travel. *Soto-Lopez*, 476 U.S. at 903. This is obviously not true. The geographical limitation creates a classification that benefits individuals who live in the Washington metropolitan area by allowing them to apply for jobs that are not open to people who reside in other states. That is not a distinction that implicates the right to travel because it does not "penalize the exercise of that right." *Id.* Many of the cases that examine whether a state law penalizes the exercise of the right to travel involve a challenge to a durational residence requirement that provides a person must live in a state for a particular period of time before being eligible to receive a certain benefit from the state. In *Shapiro*, for example, the Court invalidated laws adopted by several states that required an individual to live in the state for at least one year before receiving welfare benefits. 394 U.S. at 627. The Court has also held unconstitutional laws requiring a person to live in a state for at least one year before registering to vote, *Dunn v. Blumstein*, 405 U.S. 330, 334–43 (1972), and before receiving free nonemergency medical care, *Memorial Hospital v. Maricopa Cnty.*, 415 U.S. 238, 254–62 (1974). Although a durational residence requirement does not directly regulate travel, it does penalize the exercise of that right by prohibiting a person who has recently traveled to the state from receiving a benefit available to a longer-term resident of that state.

The AO's geographical limitation is quite different, however, because it would not penalize Pollack if she decided to travel from Kentucky to the Washington area. To the

contrary, the geographical limitation gives Pollack an incentive to travel to Washington in order to apply for a job with the AO that is open only to residents of the area. In other words, the geographical limitation burdens only Pollack's decision *not* to travel interstate.

The Ninth Circuit addressed a similar scenario in *Matsuo v. United States*, 586 F.3d 1180 (2009). There, the plaintiffs — individuals who worked for the federal government in Alaska and Hawaii — challenged a law providing that only employees of the federal government who work in the contiguous 48 states were entitled to "locality pay," an increase based upon the local cost of living. They argued the law violated their right to travel because, unlike their colleagues in the other 48 states, they did not receive locality pay. The court concluded the statute "imposes no travel penalty on them; if anything, it imposes a penalty for staying put. In fact, the [statute] encourages these employees to travel by providing superior pay in the 48 contiguous states." *Id.* at 1183. For the same reason, we think the AO's geographical limitation does not "penalize the exercise" of Pollack's right to travel interstate. *Soto-Lopez*, 476 U.S. at 903.[**]

We conclude the geographical limitation does not implicate the component of Pollack's right to travel that is

---

[**] Pollack does not argue the geographical limitation denies equal protection to a Washington area resident, who would be precluded from applying for a job with the AO if she decided to leave the area. Nor would Pollack have standing to raise that argument on behalf of a person who lives in the Washington area. We therefore need not consider the extent to which a federal law may create a classification that discourages a plaintiff from relocating to a state where she will receive a less generous benefit. *See, e.g.*, *Torres*, 435 U.S. at 1–4; *Matsuo*, 586 F.3d at 1183–85; *Minn. Senior Fed'n v. United States*, 273 F.3d 805, 807–10 (8th Cir. 2001).

protected by the equal protection principle of the Due Process Clause of the Fifth Amendment. We therefore need not consider the parties' arguments regarding the level of scrutiny applicable to the classification created by the geographical limitation or whether there is a rational basis for the AO's decision to impose the geographical limitation.

### 3. Structure of the Constitution

Finally, Pollack argues the AO's geographical limitation is inconsistent with the structure of the Constitution, particularly as it is described in *Crandall v. Nevada*, 73 U.S. 35 (1867). There, the Court declared unconstitutional a law enacted by Nevada that imposed a tax of one dollar upon every person leaving the state. Instead of relying upon a specific provision of the Constitution, the Court declared the tax incompatible with the principles underlying the Constitution generally. *Id.* at 43–44. The Court recognized both the right of the federal government to call upon its citizens to travel from one state to another and the correlative right of a citizen to travel interstate of her own accord. Pollack contends the Court expressly recognized the right she seeks to vindicate here in stating that a citizen "has the right to come to the seat of government … to share its offices, to engage in administering its functions." *Id.* at 44.

Pollack's reliance upon *Crandall* is misplaced. The Court there was concerned with a law that "actually deterred" interstate travel by taxing it. *Soto-Lopez*, 476 U.S. at 903; *see Kansas v. United States*, 16 F.3d at 441 (describing *Crandall* as a case where a law "directly burden[s] interstate travel"). As we have discussed, the AO's geographical limitation did not "actually deter" Pollack from traveling interstate; it provided an incentive to do so. In any event, *Crandall* does not hold every law that indirectly burdens interstate travel or

makes it marginally less likely a person will travel interstate implicates the Constitution. Indeed not even every tax on interstate travel violates the Constitution. *See Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 712 (holding *Crandall* does not prevent a state from imposing upon commercial airline passengers a fee to fund airport construction and maintenance).

Nor is there any support for Pollack's broader contention that the AO's geographical limitation is incompatible with the right to travel embedded in the structure of the Constitution. A law that "directly impair[s] the exercise of the right to free interstate movement" — such as the tax at issue in *Crandall* — may be deemed incompatible with the framework of the Constitution. *Saenz*, 526 U.S. at 501 ("The right of free ingress and regress to and from neighboring States, which was expressly mentioned in the text of the Articles of Confederation, may simply have been conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created" (internal quotation marks and footnote omitted)). In *Saenz* the Court invalidated a durational residence requirement enacted by California that discouraged people from relocating to that state in order to receive welfare benefits. The Court nevertheless agreed with the state that its law did not impinge upon the component of the right to travel protected by the structure of the Constitution because it "imposed no obstacle to … entry into California" and therefore did "not directly impair the exercise of the right to free interstate movement." *Id*. Just so here: The AO's geographical limitation does not "directly impair" Pollack's "right to go from one place to another" or "to cross state borders while en route." *Id.* at 500. We therefore conclude the AO's policy of limiting its applicant pool to residents of a particular area is not inconsistent with the structure of the Constitution.

C. Request for discovery

Pollack also argues the district court erred by entering summary judgment for the defendants without first directing them to respond to her requests for discovery. Pollack sought to discover, among other things, the AO's reasons for using the geographical limitation, how often it uses the limitation, the cost of reviewing applications, and whether it is more expensive to review an application submitted by a person who does not reside in the Washington area.

A party seeking discovery under FED. R. CIV. P. 56(d) has "the burden to state with sufficient particularity to the district court — or, for that matter, to this court — why discovery was necessary." *Ikossi v. Dep't of Navy*, 516 F.3d 1037, 1045 (D.C. Cir. 2008) (internal quotation marks omitted). To carry this burden, he must "outline the particular facts he intends to discover and describe why those facts are necessary to the litigation." *Convertino v. Dep't of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012). We review for an abuse of discretion a district court's decision to deny a motion for discovery. *Id.*

The district court did not abuse its discretion by denying Pollack's motion because she has not shown why the facts she intended to discover "are necessary to the litigation." *Id.* Pollack sought to discover facts showing whether it would be more burdensome for the AO to consider applicants from every state than to limit its applicant pool to residents of the Washington metropolitan area. Those facts might be necessary if the court were required to determine whether the geographical limitation is "closely related to the advancement of a substantial [government] interest" under the Privileges and Immunities Clause of Article IV, *Friedman*, 487 U.S. at 65, or whether it would survive scrutiny under the equal protection component of the Due Process Clause. As we have

explained, however, there was no need for the district court to reach those issues because the AO's geographical limitation does not implicate Pollack's right to travel under either clause. Because this case turns upon pure questions of law, the facts identified in Pollack's request for discovery are not necessary to the litigation.

## III. Conclusion

We agree with Pollack that it is difficult to comprehend why the AO refused to consider applicants who did not live in the Washington area but were willing to move there if they received an offer of employment. The AO points out that it receives applications from many qualified attorneys and it must limit the total number of applicants for certain positions so that it may focus upon those it is most interested in hiring. It is unclear, however, why the agency would use a geographical limitation to control the size of its applicant pool rather than criteria that are likely to be more closely correlated with job performance.

Be that as it may, we hold the AO's decision to limit its applicant pool to employees of the federal judiciary and individuals who lived in the Washington metropolitan area did not violate Pollack's right to travel, whether that right is considered under the Privileges and Immunities Clause of Article IV, the equal protection component of the Due Process Clause of the Fifth Amendment, or the essential structure of the Constitution. We further conclude the district court did not abuse its discretion by denying Pollack's request for discovery before entering summary judgment for the defendants. The judgment of the district court is, therefore,

*Affirmed.*