# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued May 12, 2015

Decided August 14, 2015

No. 14-5183

JEFFREY CUTLER,
APPELLANT

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-02066)

*Robert J. Muise* argued the cause for appellant. With him on the briefs was *David E. Yerushalmi*.

*Katherine Twomey Allen*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Benjamin C. Mizer*, Acting Assistant Attorney General, *Ronald C. Machen Jr.*, U.S. Attorney at the time the brief was filed, and *Mark B. Stern* and *Alisa B. Klein*, Attorneys.

Before: HENDERSON, ROGERS and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: Jeffrey Cutler's insurance company cancelled his health insurance plan because it did not comply with the requirements of the Patient Protection and Affordable Care Act ("Affordable Care Act" or "Act"), Pub. L. No. 111-148, 124 Stat. 119 (2010). He objects to the requirement that he buy compliant insurance for personal, but not religious, reasons. So he filed suit challenging the religious exemption in the Affordable Care Act as an unconstitutional establishment of religion. He also argues that the Administration's decision to temporarily suspend enforcement of some of the Act's requirements for a transitional period deprived him of the equal protection of the laws. While we disagree with the district court's holding that he lacked standing to press his Establishment Clause challenge, long-settled precedent dooms his claim on the merits. Cutler lacks standing to assert his equal protection claim because nothing in the transitional policy requires him to buy insurance; his inability to maintain his old plan was the independent choice of his insurer.

# I

## Statutory and Regulatory Framework

Congress enacted the Affordable Care Act in 2010 in an effort to "increase the number of Americans covered by health insurance and decrease the cost of health care." *National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566, 2580 (2012). Key to the Act's "interlocking reforms," *King v. Burwell*, No. 14-114, 576 U.S. ___, slip op. at 1 (June 25, 2015), is a general requirement that individuals must maintain health insurance coverage or pay a tax penalty to the Internal Revenue Service. 26 U.S.C. § 5000A. Without that obligation to obtain insurance, Congress found, "many individuals would wait to purchase health insurance

until they needed care," 42 U.S.C. § 18091(2)(I), creating an "adverse selection * * * death spiral" that would destabilize insurance markets, *King*, slip op. at 2.[1]

Consistent with the statutory goals of near-universal coverage and protecting the efficient functioning of the health insurance market, 42 U.S.C. § 18091(2)(D) and (I), Congress allowed only carefully limited exceptions to the general obligation to maintain health insurance. *See Seven-Sky v. Holder*, 661 F.3d 1, 6 (D.C. Cir. 2011). Of relevance here, the Affordable Care Act generally exempts those with sincere religious objections to purchasing health insurance. *See* 26 U.S.C. § 5000A(d)(2). Specifically, the Act provides for a "religious conscience exemption" that applies to an individual

---

[1] "Adverse selection" is an economic term of art that describes problems that can arise in insurance markets when the healthy have insufficient incentive to purchase health insurance, and thus the resulting pool of insureds consists predominantly of the sick and those actively using their insurance. As the Supreme Court explained in *King v. Burwell*, some state-level precursors to the Affordable Care Act, by banning the denial of insurance for preexisting conditions, had

> encouraged people to wait until they got sick to buy insurance. Why buy insurance coverage when you are healthy, if you can buy the same coverage for the same price when you become ill? This consequence—known as 'adverse selection'—led to a second: Insurers were forced to increase premiums to account for the fact that, more and more, it was the sick rather than the healthy who were buying insurance.

No. 14-114, 576 U.S. ___, slip op. at 2.

who is both "(i) a member of a recognized religious sect or division thereof which is described in [26 U.S.C.] section 1402(g)(1)," and "(ii) an adherent of established tenets or teachings of such sect or division as described in such section." 26 U.S.C. § 5000A(d)(2)(A)(i)–(ii).

Section 1402(g)(1) of Title 26, in turn, houses the religious exemption from Social Security and Medicare taxes, which Congress enacted as part of the Social Security Amendments of 1965, Pub. L. No. 89-97, 79 Stat. 286. That provision allows an individual who, because of religious faith, is "conscientiously opposed to acceptance of the benefits of any private or public [health] insurance," to opt out of the Social Security and Medicare programs. 26 U.S.C. § 1402(g)(1).[2]

To qualify for the exemption, an individual must prove "membership in, and adherence to the tenets or teachings of,

---

[2] Section 1402(g)(1) provides in full:

> Any individual may file an application (in such form and manner, and with such official, as may be prescribed by regulations under this chapter) for an exemption from the tax imposed by this chapter if he is a member of a recognized religious sect or division thereof and is an adherent of established tenets or teachings of such sect or division by reason of which he is conscientiously opposed to acceptance of the benefits of any private or public insurance which makes payments in the event of death, disability, old-age, or retirement or makes payments toward the cost of, or provides services for, medical care (including the benefits of any insurance system established by the Social Security Act).

26 U.S.C. § 1402(g)(1).

the sect or division thereof" and must waive "all benefits and other payments" under the Social Security and Medicare programs. 26 U.S.C. § 1402(g)(1)(A)–(B). In addition, the Commissioner of Social Security must find that (i) the "sect or division thereof has the [relevant] established tenets or teachings[,]" (ii) "it is the practice * * * for members of such sect or division thereof to make provision for their dependent members," and (iii) "such sect or division thereof has been in existence at all times since December 31, 1950." *Id.* § 1402(g)(1)(C)–(E).[3]

---

[3] Specifically, an application for religious exemption under Section 1402(g)(1) "may be granted only if the application contains or is accompanied by—

>    (A) such evidence of such individual's membership in, and adherence to the tenets or teachings of, the sect or division thereof as the Secretary may require for purposes of determining such individual's compliance with the preceding sentence, and
>
>    (B) his waiver of all benefits and other payments under titles II and XVIII of the Social Security Act on the basis of his wages and self-employment income as well as all such benefits and other payments to him on the basis of the wages and self-employment income of any other person,

and only if the Commissioner of Social Security finds that—

>    (C) such sect or division thereof has the established tenets or teachings referred to in the preceding sentence,
>
>    (D) it is the practice, and has been for a period of time which he deems to be substantial, for members of such sect or division thereof to make provision for their dependent members which in his judgment is reasonable in view of their general level of living, and
>
>    (E) such sect or division thereof has been in existence at all times since December 31, 1950.

26 U.S.C. § 1402(g)(1)(A)–(E).

The Affordable Care Act religious exemption thus comes as a package deal with the Medicare and Social Security religious exemption. The qualifications for each include not only sincere religious belief, but also membership in a group with an established track record of providing care for its members in need and thus ensuring that the cost of their care is not transferred to the public.

Aside from the coverage requirement for individuals, the Affordable Care Act imposes a number of requirements on insurance providers and employers who offer health insurance to their workers, such as the guaranteed availability of coverage and a prohibition on refusing coverage due to an applicant's pre-existing medical condition. *See* 42 U.S.C. § 300gg-1. The Centers for Medicare and Medicaid Services ("the Centers"), which is part of the Department of Health and Human Services, oversees the implementation of many of the legislatively mandated changes.

Several of the Affordable Care Act's new requirements were scheduled to take effect on January 1, 2014, including provisions governing insurance premiums and discrimination on the basis of preexisting conditions. *See* 42 U.S.C. § 300gg (relating to fair health insurance premiums); *id.* § 300gg-1 (relating to guaranteed availability of coverage and ban on pre-existing condition requirements); *id.* § 300gg (note) (effective date). But the Centers determined that many "affected individuals and small businesses * * * [were] finding that [Affordable Care Act-compliant] coverage would be more expensive than their current coverage, and thus they may be dissuaded from immediately transitioning to such coverage." Letter from Gary Cohen, Director, Center for Consumer Information and Insurance Oversight, Centers for Medicare and Medicaid Services, to State Insurance

Commissioners, Nov. 14, 2013, at 1.[4] Accordingly, the Centers announced a "transitional policy" under which "health insurance issuers may choose to continue coverage that would otherwise be terminated or cancelled" as non-compliant with the Affordable Care Act, and the renewed plans "will not be considered to be out of compliance" with the statute. *Id.* The announcement also "encouraged" state insurance regulators to "adopt the same transitional policy[.]" *Id.* at 3. That transition period was ultimately extended until October 1, 2016. *See* Centers for Medicare and Medicaid Services, Insurance Standards Bulletin Series – Extension of Transitional Policy through Oct. 1, 2016 (March 5, 2014).[5]

**Factual and Procedural History**

Jeffrey Cutler is a resident of Pennsylvania. Complaint ¶ 1, J.A. 11. He is "financially stable, has an annual income that requires him to file federal tax returns, and could afford health insurance if he wanted to obtain such coverage." *Id.* ¶ 5, J.A. 12. He is non-observant in his religion, and does not qualify for the Affordable Care Act's religious exemption. *Id.* He is "not covered, nor wishes to be mandated to be covered, under any health insurance plan" meeting the Affordable Care Act's requirements. *Id.* ¶ 15, J.A. 15. He alleges that he "had health insurance which was cancelled due to the changes specified by regulations that altered the law as approved." *Id.*

---

[4]Available at http://www.cms.gov/CCIIO/Resources/Letters/Downloads/commissioner-letter-11-14-2013.PDF (last visited August 6, 2015).

[5] Available at http://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/transition-to-compliant-policies-03-06-2015.pdf (last visited August 6, 2015).

¶ 24, J.A. 17. He "does not want to be forced to purchase health insurance." *Id.*

Cutler, proceeding *pro se*, filed suit in the United States District Court for the District of Columbia to challenge the Affordable Care Act as unconstitutional, both facially and as applied to him. Complaint ¶ 20, J.A. 16. Specifically, his complaint alleged that the religious exemption in the Act violates the First Amendment's guarantee of religious freedom. *Id.* ¶ 1, J.A. 11.

Cutler later filed a motion for partial summary judgment, in which he raised for the first time a separate claim that the transitional policy, as implemented, violates his "rights under the Equal Protection Clause in the Fourteenth Amendment[.]" Plaintiff's Motion for Partial Summary Judgment at 2, J.A. 23. Specifically, he objected that "state insurance commissioners are now empowered to override the law—'if you like your plan you can keep it, but only in NY, CT, CA, etc.'" *Id.*

The district court granted the government's motion to dismiss, reasoning that Cutler lacked standing to bring either claim. *See Cutler v. Department of Health and Human Services*, 52 F. Supp. 3d 27, 33 (D.D.C. 2014). As for equal protection, the court noted that Cutler "makes no claim as to how he is injured * * * by the alleged fact that the Act will be enforced differently in different states." *Id.* at 35 n.4.[6]

---

[6] Although Cutler brought his equal protection challenge under the Fourteenth Amendment, which applies to the States and not to the federal defendants, the district court treated Cutler's claim as if it were brought under the equal protection component of the Fifth Amendment's Due Process Clause, which applies to the federal government. *Cutler*, 52 F. Supp. 3d at 31 n.3; *see also, e.g.,*

With respect to the Establishment Clause challenge, the district court found no standing because Cutler "bases his challenge to the religious exemption on the fact that such exemptions harm everyone by their mere existence and not that the exemption personally harms him." *Cutler*, 52 F. Supp. 3d at 37. The court reasoned that, even if Cutler's Establishment Clause challenge succeeded, "[h]e would be subject to the individual mandate and would be required to either obtain health insurance coverage or pay the penalty," and so "the fact that he is subject to the individual mandate[] is not redressed by declaring the religious exemption invalid." *Id.* at 38. The court did not agree with Cutler that, if it found the religious exemption invalid, it would have to strike down the entire law. *Id.*

Nevertheless, "given the evolution of the taxpayer standing doctrine and in an abundance of caution," the court addressed Cutler's exemption challenge on the merits. *Cutler*, 52 F. Supp. 3d at 38 (internal citations omitted). The court followed the Fourth Circuit's decision in *Liberty University v. Lew*, 733 F.3d 72 (4th Cir. 2013), and held that the exemption served a secular legislative purpose, had the primary effect of ensuring coverage rather than advancing or inhibiting religion, and created no excessive entanglement with religion. *See Cutler*, 52 F. Supp. 3d at 39–40. The district court also noted that the religious exemption in the Affordable Care Act "incorporates the same provision of the Social Security Amendments of 1965," which courts have repeatedly upheld against Establishment Clause challenge. *Id.* at 40 n.8.

---

*Pollack v. Duff*, --- F.3d ---, 2015 WL 4079788 (D.C. Cir. July 7, 2015) ("[T]he principle of equal protection indisputably applies to the federal government as well as to the states."). We do likewise.

## II

## Analysis

### *Standard of Review*

We review the district court's dismissal of Cutler's complaint on both standing and merits grounds *de novo*. *See Brown v. Whole Foods Market Group, Inc.*, 789 F.3d 146, 150 (D.C. Cir. 2015). In so doing, we accept the factual allegations in the complaint as true, and grant Cutler the benefit of all reasonable inferences that can be drawn in his favor. *See id*. And because Cutler proceeded below without counsel, we hold his district court filings to "less stringent standards than formal pleadings drafted by lawyers[.]" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

## Establishment Clause Challenge

### *Standing*

The first thing we must decide is whether we can decide. If Cutler lacks standing to bring his claims in federal court, then we are powerless to decide the case and must dismiss it. *See, e.g.*, *Florida Audobon Society v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) ("[A] showing of standing 'is an essential and unchanging' predicate to any exercise of our jurisdiction.") (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

The "irreducible constitutional minimum of standing" is that (i) the plaintiff suffered an "injury in fact," meaning "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or

hypothetical"; (ii) the injury must be "fairly traceable to the challenged action of the defendant"; and (iii) a favorable decision by the court must be likely to redress the injury. *Lujan*, 504 U.S. at 560–561 (internal citations, quotation marks, and alterations omitted).

The party invoking federal jurisdiction bears the burden of showing each of those elements, "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Because the district court dismissed this case at the complaint stage, Cutler need only make a plausible allegation of facts establishing each element of standing. *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002) ("[W]here the defendant contests only the legal sufficiency of plaintiff's jurisdictional claims, the standard is similar to that of Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief."). In evaluating standing at this juncture, we must assume that the party asserting federal jurisdiction is correct on the legal merits of his claim, "that a decision on the merits would be favorable and that the requested relief would be granted[.]" *In re Thornburgh*, 869 F.2d 1503, 1511 (D.C. Cir. 1989).

Applying those standards, we conclude that Cutler has standing to bring his Establishment Clause challenge to the religious exemption. His objection is straightforward: Because he is neither a member of a religious group that qualifies for the religious exemption nor religiously opposed to obtaining insurance, he must either pay for a statutorily compliant insurance plan or pay a penalty. Cutler argues that allowing individuals to avoid both paying for insurance and paying the penalty if they abjure insurance for religious reasons, but not if they abjure it for secular reasons, violates

the Establishment Clause because it favors faith over his non-belief. In so doing, Cutler has adequately alleged an injury in fact to his constitutional right not to be treated differently—not to be penalized for lacking insurance—just because he is not religiously motivated. *See, e.g.*, *McCreary County, Kentucky v. American Civil Liberties Union of Kentucky*, 545 U.S. 844, 860 (2005) ("[T]he First Amendment mandates governmental neutrality between * * * religion and nonreligion.") (internal citation and quotation marks omitted). That injury, in turn, stems directly from the religious exemption in the Affordable Care Act, as that is what causes him to be subject to a penalty when religious objectors to purchasing insurance are not. *See Sissel v. United States Dep't of Health and Human Services*, 760 F.3d 1, 5 (D.C. Cir. 2014); *see generally Lujan*, 504 U.S. at 560 (injury must be "fairly traceable to the challenged action of the defendant") (internal quotation marks and alterations omitted).

Finally, because we must assume at this stage that the requested relief would be granted, Cutler satisfies the redressability prong of the standing inquiry. In his complaint, Cutler seeks wholesale invalidation of the Affordable Care Act, *see* Complaint, Prayer ¶ 4, while his appellate briefing suggests that he might be satisfied with a court order "enjoining the enforcement of the penalty provision as applied against Plaintiff," Cutler Br. 18. Either way, if this court were to give Cutler what he wants, his Establishment Clause injury—the differential treatment because of his lack of religious objection—would disappear. *See In re Thornburgh*, 869 F.2d at 1511 ("[T]he redressability test asks whether a plaintiff's injury would be likely to be redressed *if the requested relief were granted*.") (emphasis in original).

The district court read Cutler's complaint as asserting injury solely in his objection to the existence of a religious

exemption, which the court deemed to be the type of "generalized grievance" that will not support standing. *Cutler*, 52 F. Supp. 3d at 37. That was mistaken. Cutler is explicit that he is injured by being forced to choose between paying for compliant insurance and paying a penalty. That is the type of direct and concrete injury that satisfies Article III, *see Sissel*, 760 F.3d at 5, regardless of how many other people face the same financial choice. "[A]n injury shared by a large number of people is nonetheless an injury." *Center for Auto Safety v. National Highway Traffic Safety Admin.*, 793 F.2d 1322, 1324 (D.C. Cir. 1986); *see also Federal Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998) ("[W]here a harm is concrete, though widely shared, the Court has found injury in fact.") (internal citation and quotation marks omitted).

The government argues that removing the religious exemption—while leaving the rest of the Affordable Care Act in place—would leave Cutler in precisely the same position with respect to his own obligations under the Act. The Supreme Court rejected the exact same standing argument in *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987). The Arkansas Writers' Project challenged the constitutionality of a tax exemption afforded to some newspapers and journals, but not to its magazine. Just as the government argues here, the state supreme court had ruled that the constitutional challenge that the tax was "invalid, as discriminatory" was not properly raised: "[I]t would avail [appellant] nothing if it wins its argument" since "it is the exemption that would fall, not the tax against" the appellant. *Id*. at 226 (quoting *Ragland v. Arkansas Writers' Project*, 698 S.W.2d 802, 803 (Ark. 1985)) (brackets in original).

The U.S. Supreme Court thought otherwise. Reasoning that the "constitutional attack holds the only promise of escape from" the differential "burden," the Supreme Court

held that the Arkansas Writers' Project did have Article III standing. *Arkansas Writers' Project*, 481 U.S. at 227 (quoting *Orr v. Orr*, 440 U.S. 268, 273 (1979)). To adopt the state's "notion of standing," the Supreme Court concluded, would "effectively insulate underinclusive statutes from constitutional challenge[.]" *Id.*

Moreover, in analyzing the redressability prong of standing, it must be remembered that "a court sustaining" an equal protection claim faces "'two remedial alternatives: [it] may either declare [the statute] a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by the exclusion.'" *Heckler v. Matthews*, 465 U.S. 728, 738–739 (1984)) (quoting *Welsh v. United States*, 398 U.S. 333, 361 (1970) (Harlan, J., concurring in the result)); *see also, e.g.*, *Jacobs v. Barr*, 959 F.2d 313, 317 (D.C. Cir. 1992) (same); *Dumaguin v. Secretary of Health and Human Services*, 28 F.3d 1218, 1222 (D.C. Cir. 1994) (same). Thus, because one response to the differential-treatment challenge would be for the government to expand the exemption and treat Cutler's non-religious objection to obtaining insurance equally, and "we have no way of knowing how the [government] will in fact respond," Cutler "must be held to have standing here." *Orr v. Orr*, 440 U.S. 268, 272 (1979).

### Challenges to the Religious Exemption

Settled precedent answers Cutler's argument that the Affordable Care Act's religious accommodation provision runs afoul of the Establishment Clause. The religious exemption in the Affordable Care Act, like its counterpart in the Social Security Act, accommodates religion by exempting all believers whose faith system provides an established,

alternative support network that ensures individuals will not later seek to avail themselves of the federal benefits for which they did not contribute. Cutler is correct that the Affordable Care Act withholds a similar exemption for non-believers. But the Supreme Court has repeatedly held that "the government may accommodate religious practices without violating the Establishment Clause." *Cutter v. Wilkinson*, 544 U.S. 709, 713 (2005) (internal citations, quotation marks, and alterations omitted); *see also Locke v. Davey*, 540 U.S. 712, 718 (2004); *Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136, 144 (1987).

Even more to the point, the Supreme Court has addressed the religious exemption in the Social Security Act that the Affordable Care Act replicates as an "accommodat[ion], to the extent compatible with a comprehensive national program, [of] the practices of those who believe it a violation of their faith to participate in the social security system." *United States v. Lee*, 455 U.S. 252, 260 (1982). In creating that exemption, the Supreme Court continued, Congress "provided for a narrow category which was readily identifiable," in a manner "sensitive to the needs flowing from the Free Exercise Clause." *Id.* at 260–261.

The religious accommodation in the Affordable Care Act, like the Social Security exemption it mirrors, is narrow. The exemption is available only to those (i) whose sincere religious beliefs prevent them from subscribing to any form of health insurance, *and* (ii) whose faith communities have a demonstrated track record of taking care of their dependent members. Those factors together alleviate any Establishment Clause concerns in two ways.

*First*, by limiting the exemption to those whose sincerely held faith beliefs flatly forbid participation in the federal

program, the accommodation is carefully confined to "alleviat[ing] exceptional government-created burdens on private religious exercise." *Cutter*, 544 U.S. at 720. Democratic government, after all, cannot survive if every political or personal objection to a government-imposed obligation must be accommodated. Confining the exemption to members of faith groups for whom an established and pre-existing belief system forbids the benefits as well as the burdens of the governmental program allows those believers to avoid "a hard choice between contravening imperatives of religion and conscience or suffering penalties." *Gillette v. United States*, 401 U.S. 437, 445 (1971); *see also Employment Division, Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872, 890 (1990) ("[A] society that believes in the negative protection accorded to religious belief can be expected to be solicitous of that value in its legislation as well."); *Lee v. Weisman*, 505 U.S. 577, 628 (1992) (Souter, J., concurring) ("[G]eneral rules can unnecessarily offend the religious conscience when they offend the conscience of secular society not at all."); *Board of Education of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687, 715 (1994) (O'Connor, J., concurring in part and concurring in the judgment) ("What makes accommodation permissible, even praiseworthy, is not that the government is making life easier for some particular religious group as such. Rather, it is that the government is accommodating a deeply held belief.").

*Second*, the requirement that the faith system have a proven track record of providing an alternative safety net for members helps to ensure that the religious adherents will not later seek to avail themselves of public services to which they have not contributed. The Affordable Care Act, just like the Social Security exemption, is carefully calibrated to protect the government—and thus taxpayers who do not share the religious sensibilities of those covered by the exemption—

from later having to pick up the tab from which the adherent has been exempted. *See Cutter*, 544 U.S. at 722 ("Our decisions indicate that an accommodation must be measured so that it does not override other significant interests.").

Cutler argues that the exemption impermissibly discriminates between religions, exempting only those that meet the foregoing criteria. That argument fails because the qualifications for exemption are not drawn on sectarian lines; they simply sort out which faiths have a proven track record of adequately meeting the statutory goals. And the exemption promotes the Establishment Clause's concerns by ensuring that those without religious objections do not bear the financial risk and price of care for those who exempt themselves from the tax. As configured by this specific statutory framework, that is an objective, non-sectarian basis for cabining the exemption's reach. *See Cutter*, 544 U.S. at 720 (government "must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries"); *see also Children's Healthcare is a Legal Duty, Inc. v. Min De Parle*, 212 F.3d 1084, 1091 (8th Cir. 2000).

## Equal Protection Claim

Cutler alleges that the transitional policy, which allows States to permit the issuance of non-Affordable Care Act compliant insurance plans for an interim period, deprives him of equal protection of the law. As Cutler understands the law, the transitional policy allows States to choose not only to delay implementation of the Affordable Care Act's requirements and thus *allow* non-compliant plans, but also to *force* insurers to continue to offer non-compliant plans. Cutler claims that Arkansas has done just that, requiring insurers to continue issuing policies that flunk the Affordable

Care Act's requirements. Pennsylvania, where Cutler lives, has merely opted to allow—but not demand—non-compliant plans to continue. So, according to Cutler's allegations, if he lived in Arkansas, his old insurance plan would have remained available to him, and he would not have to pay a tax penalty. Because he lives in Pennsylvania where the law permitted his insurance company to cancel his plan, he cannot go back to his old insurance plan and, as a result, Cutler must either pay the penalty or subscribe to a different plan against his will.

It is highly dubious whether that argument even plausibly alleges an Article III injury because Arkansas law, on its face, does not require insurers to offer non-compliant plans. A quick glance at the Arkansas insurance bulletin upon which Cutler relies (but declines to quote) reveals that Arkansas, like Pennsylvania, permits but does not compel the continuation of non-compliant plans during the transition period. *See* Arkansas Insurance Dep't, Bulletin No. 6-2014 (March 6, 2014) ("[T]he Department *suggests* that insurers credit or adjust rates for those groups which have already renewed under [Affordable Care Act] compliance rates, and permit re-enrollment of the group in the earlier [*i.e.*, non-compliant] plan, if the group desired or desires to renew under the earlier non-grandfathered plan.") (emphasis added).[7] In other words, Cutler has not even colorably alleged a differential-treatment injury because there is no differential treatment.

In any event, Cutler lacks Article III standing to pursue his equal protection challenge because his alleged injury is not fairly traceable to the transitional policy, nor would it be

---

[7]  Available at http://www.insurance.arkansas.gov/Legal/Bulletins/6-2014.pdf (last visited August 6, 2015).

redressed by striking down that policy. The transitional policy applies evenhandedly across the United States, so if Cutler cannot obtain the insurance he desires and others can, that is because his own insurer cancelled his policy. Cutler's injury is thus the result of the action of his private insurer, not the transitional policy, and it is purely speculative whether an order in this case would alter or affect the non-party insurers' decision. *See Simon v. Eastern Kentucky Welfare Rights Org.*, 416 U.S. 26, 41–42 (1976); *National Wrestling Coaches Ass'n v. Department of Education*, 366 F.3d 930, 938 (D.C. Cir. 2004) (no standing because it is "purely speculative that a requested change in government policy will alter the behavior of the regulated third parties that are the direct cause of the plaintiff's injuries").

## III

## Conclusion

Cutler has standing to litigate his Establishment Clause claim, but it fails on the merits. He lacks standing to press his equal protection challenge.

*So ordered.*