# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 5, 2016                Decided May 13, 2016

No. 15-5164

AMERICAN FREEDOM LAW CENTER AND ROBERT JOSEPH
MUISE,
APPELLANTS

v.

BARACK HUSSEIN OBAMA, IN HIS OFFICIAL CAPACITY AS
PRESIDENT OF THE UNITED STATES OF AMERICA, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-01143)

———

*Robert Joseph Muise* argued the cause for appellants.
With him on the briefs was *David Yerushalmi*.

*Katherine Twomey Allen*, Attorney, U.S. Department of
Justice, argued the cause for appellees. With her on the brief
were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney
General, and *Mark B. Stern* and *Alisa B. Klein*, Attorneys.

Before: GRIFFITH, SRINIVASAN and WILKINS, *Circuit
Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

2

WILKINS, *Circuit* Judge: Appellants Robert Muise and American Freedom Law Center allege that their health insurance premiums increased by 57% at the end of 2014, and claim that the Affordable Care Act ("ACA") is to blame. Specifically, Appellants contend that in late 2013, the Department of Health and Human Services ("HHS") unlawfully implemented two policies: a "Transitional Policy," which permitted health insurance companies to temporarily continue providing health insurance plans that do not comply with ACA requirements; and a "Hardship Exemption," which permitted some individuals whose policies were cancelled for noncompliance to avoid the penalty under the individual mandate. These actions, Appellants argue, caused fewer people to purchase ACA-compliant plans. They assert that the Transitional Policy drove up the cost of ACA-compliant plans, such as the one purchased by Appellants. They also claim that HHS violated equal protection principles by applying either the Transitional Policy or the Hardship Exemption in a discriminatory fashion. At issue in this case is whether Appellants have standing to raise their challenges.

We affirm the District Court's determination that Appellants lack standing. Appellants have failed to demonstrate that the Transitional Policy caused Appellants' insurer, Blue Cross Blue Shield of Michigan ("Blue Cross"), to increase the premium for their health care plan specifically. Additionally, any alleged injury to Appellants from the Transitional Policy stemmed not from the Policy itself, which HHS applied evenhandedly, but from Blue Cross's decision not to take advantage of the Policy. Accordingly, Appellants also lack standing to bring their equal protection challenge.

3

**I.**

**A.**

The ACA, enacted by Congress in 2010, "aims to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2580 (2012). Among other things, the ACA institutes an individual mandate, which requires each "applicable individual" to purchase health insurance by maintaining "minimum essential coverage," and requires those who fail to do so to pay a "penalty." 26 U.S.C. § 5000A(a)-(c). In enacting the ACA, Congress acknowledged that the individual mandate was an important part of the overall functioning of the law, noting that "significantly increasing health insurance coverage . . . will minimize . . . adverse selection and broaden the health insurance risk pool to include healthy individuals, which will lower health insurance premiums." 42 U.S.C. § 18091(2)(I).

The ACA also imposes a number of new "market reforms," setting forth minimum standards that all offered health insurance plans must meet. *See, e.g.*, *id.* § 300gg (prohibiting discriminatory premium rates); *id.* § 300gg-1 (guaranteeing issuance of coverage); *id.* § 300gg-3 (prohibiting preexisting conditions exclusions); *id.* § 18022 (defining essential health benefits requirements). These reforms were scheduled to take effect on January 1, 2014. *See Cutler v. HHS*, 797 F.3d 1173, 1177 (D.C. Cir. 2015) (citing 42 U.S.C. § 300gg (note)). Prior to that time, certain health insurance providers began cancelling some health insurance plans that did not comply with the ACA's reforms. In a letter HHS sent to state insurance commissioners in November 2013, it explained that

> [a]lthough affected individuals and small businesses may access quality health insurance coverage through the new Health Insurance Marketplaces, in many cases with federal subsidies, some of them are finding that such coverage would be more expensive than their current coverage, and thus may be dissuaded from immediately transitioning to such coverage.

J.A. 43. To ameliorate this problem, HHS announced in its letter a Transitional Policy, whereby HHS would not enforce the ACA's market reform requirements against health insurance providers until October 2014. J.A. 43-45. It later extended that deadline ultimately to October 2017.[1] The Transitional Policy thus allowed individuals whose plans otherwise would have been terminated to keep their original health insurance during this transitional period, so long as their health insurance provider agreed to continue issuing their plan. The Policy, however, applies solely to health insurance providers, which are given the option of temporarily providing non-ACA-compliant plans, though they are not required to do so. The Policy does not apply to individuals, who still are required to comply with the ACA's individual mandate, unless they qualify for the Hardship Exemption.

---

[1] In March 2014, HHS extended the policy for an additional two years, to October 1, 2016. J.A. 50-51. In February 2016, it extended the transitional period for an additional year, to October 1, 2017. Letter from Kevin Counihan, Dir., Ctr. for Consumer Info. & Ins. Oversight (February 29, 2016), www.cms.gov/CCIIO/Resource s/Regulations-and-Guidance/Downloads/final-transition-bulletin-2-29-16.pdf.

**B.**

Robert Muise is the co-founder and senior counsel of AFLC, a nonprofit corporation whose "mission . . . is to fight for faith and freedom through litigation, education, and public policy programs." Muise Decl. ¶¶ 2-4 (internal quotation marks omitted). Muise receives health insurance through AFLC's group health plan, which is issued by Blue Cross. *Id.* ¶ 6. After passage of the ACA, Blue Cross informed AFLC that its "current plan [was] changing" and that it would "be transitioning [AFLC] into a reform-compliant plan." J.A. 60. Thus, Blue Cross chose not to continue offering Appellants' original health insurance plan, even though it could have continued to do so during the period established by the Transitional Policy. Appellants allege that when Blue Cross transitioned to that reform-compliant plan, the monthly premium AFLC paid for Muise's health insurance plan increased from $1,349.96 to $2,121.59 – an increase of 57% ($771.63). *See* Muise Decl. ¶ 13.

In a June 2014 rate filing, Blue Cross explained that there would be a 2.7% rate increase for 2015 "for all small group products that were offered in 2014," such as Appellants' plan. J.A. 80. They listed four "[s]ignificant drivers of the rate change," one of which was "[l]ower than anticipated improvement of the ACA compliant market level risk pool in 2014 and 2015 due to the market being allowed to extend pre-ACA . . . plans into 2016." *Id.* In other words, Blue Cross blamed the rate increase, in part, on the ability of individuals to retain non-ACA-compliant coverage, presumably due to HHS's Transitional Policy. In a later, March 2015 rate filing,[2] Blue Cross reversed course, and noted that there

---

[2] This filing was not included in the record before the District Court or before us on appeal, but it is publicly available. *See* Actuarial Memorandum, Blue Cross Blue Shield Michigan, BCBSM 2015

would be a 3.3% decrease for policies issued between July 1, 2015, and December 31, 2015. 2015 Blue Cross Filing 6. It listed two "[s]ignificant drivers" for the rate change: (1) "2014 trend results coming in much lower than anticipated"; and (2) "[s]hifts in market risk assumptions after the allowance by the government for carriers to extend offerings of pre-reform plans." *Id.* Thus, although Blue Cross appeared to blame its initial rate increase, in part, on the consequences of the Transitional Policy, it seemed to also credit, in part, the Policy with the later rate decrease.

Appellants filed suit in July 2014, challenging the Transitional Policy as an "unlawful executive action[]" issued by "executive fiat." Compl. ¶¶ 33, 46. They claim that the Policy caused their health insurance costs to increase. *Id.* ¶ 49. Additionally, they assert an equal protection challenge, claiming that Appellees violated the Fifth Amendment by allowing certain individuals to benefit from the Policy, thereby exempting them from the individual mandate, but not providing this exemption to others, including Appellants. *Id.* ¶ 62.

The District Court granted Appellees' motion to dismiss the case pursuant to Rule 12(b)(1) of the Federal Rules of Civil procedure, holding that Appellants lacked standing. *Am. Freedom Law Ctr. v. Obama*, 106 F. Supp. 3d 104, 113 (D.D.C. 2015). It determined, among other things, that Appellants had failed to demonstrate that whatever injury they

---

Small Group Rate Filing (Mar. 23, 2015), https://filingaccess.serff.com/sfa/home/MI (follow "Begin Search"; follow "Accept"; enter "BBMI-129573445" in the field labeled "SERFF Tracking Number"; select "Blue Cross Blue Shield of Michigan"; select the document titled "Actuarial Memorandum 3Q2015 BCBSMSG 20150330 Final.pdf") [hereinafter 2015 Blue Cross Filing].

alleged to have suffered was caused by HHS's Transitional Policy, noting that "health insurance premiums fluctuate for myriad reasons, ranging from the particular terms of coverage to various other actuarial factors." *Id.* at 109.

## II.

The only question in this appeal is whether Appellants have standing to bring this suit. Because they have failed to show that the increase in their health care premiums stems from HHS's Transitional Policy, Appellants have not demonstrated that they have standing. We affirm the District Court's dismissal pursuant to Rule 12(b)(1).

## A.

We review a District Court's decision regarding standing *de novo*. *Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003). The "irreducible constitutional minimum of standing contains three elements": (1) injury-in-fact, (2) causation, and (3) redressability." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Stated differently, "a litigant must demonstrate a 'personal injury fairly traceable to the [opposing party's] allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 464 (D.C. Cir. 2009) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).

When "[t]he existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict,'" it becomes "'substantially more difficult' to establish" standing. *Lujan*, 504 U.S. at 562 (quoting *ASARCO Inc. v. Kadish*, 490 U.S.

605, 615 (1989) (opinion of Kennedy, J.); *Allen*, 468 U.S. at 758); *accord Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004). "[M]ere 'unadorned speculation' as to the existence of a relationship between the challenged government action and the third-party conduct 'will not suffice to invoke the federal judicial power.'" *Nat'l Wrestling*, 366 F.3d at 938 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976)). "The greater number of uncertain links in a causal chain, the less likely it is that the entire chain will hold true." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996) (en banc). However, where "the alleged injury flows not directly from the challenged agency action, but rather from independent actions of third parties, we have required only a showing that 'the agency action is at least a substantial factor motivating the third parties' actions.'" *Tozzi v. HHS*, 271 F.3d 301, 308 (D.C. Cir. 2001) (quoting *Cmty. for Creative Non-Violence v. Pierce*, 814 F.2d 663, 669 (D.C. Cir. 1987)).

In considering a motion to dismiss for lack of subject matter jurisdiction, courts are required to "accept as true all of the factual allegations contained in the complaint." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n.1 (2002). Nonetheless, we "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

**B.**

Accepting, for the sake of argument, that Appellants have demonstrated that they have suffered a concrete injury in fact, they have failed to show that HHS's Transitional Policy caused that injury. At oral argument, Appellants conceded that the injury they claim is solely a prospective one; they

assert that the Transitional Policy will cause them to pay more for their health insurance in the future. This assumption, however, is speculative.

The only evidence Appellants offer to demonstrate that the Policy caused, or will cause, their alleged injury is Blue Cross's 2014 rate increase filing, which included as a reason for the rate increase the fact that the overall risk pool for ACA-compliant plans was smaller than Blue Cross had anticipated. But that statement alone is not enough to show causation here.

First, it is unclear whether the rate increase discussed in Blue Cross's filing applied to Appellants' health care plan at all. The filing stated that Blue Cross's rates would increase overall by 2.7%, but makes clear that the increase was an average across all of Blue Cross's plans. It notes that the rate changes discussed in the filing "vary slightly by product and plan," J.A. 80, and provides a chart showing that some plans increased by as much as 3.3%, while others did not increase at all. *See id.* at 81. Appellants failed to specify before the District Court which plan Blue Cross transitioned them to after it discontinued their old plan, *see Am. Freedom Law Ctr.*, 106 F. Supp. 3d at 112, and they have provided no further information on appeal. We are therefore left to guess whether Appellants' current plan was one of the plans for which Blue Cross noted a rate increase in its 2014 filing.

Second, although it appears that the price of at least some of Blue Cross's plans increased at the beginning of 2015, the price of those same plans appears to have decreased in the second half of 2015.[3] According to Appellants, "basic

---

[3] Unlike its June 2014 filing, which showed a price increase in only certain plans, Blue Cross's March 2015 filing showed a decrease in every plan's price. *See* 2015 Blue Cross Filing 7.

economic principles" establish a direct link between the supposed decrease in the number of individuals in ACA-compliant risk pools allegedly caused by HHS's Transitional Policy and the asserted increase in the price of Appellants' health insurance plan. Appellant's Br. 41. But as Blue Cross's two rate filings reveal, the effect of various factors, including the size of risk pools, on health insurance pricing is far from "basic," and Appellants have made no concrete allegations, nor provided any specific evidence, establishing that the cost of their health insurance plan is likely to increase in the future, let alone that such an increase will stem from the Transitional Policy. This is a major missing link in the causal chain Appellants must establish to demonstrate that HHS's Transitional Policy is a "substantial factor motivating" Appellants' alleged harm. *Tozzi*, 271 F.3d at 308 (quoting *Cmty. for Creative Non-Violence*, 814 F.2d at 669).

Moreover, as discussed above, we do not know whether Appellants' health insurance plan was one of the plans affected by the rate increase discussed in Blue Cross's 2014 filing. Accordingly, even if we did accept that HHS's Transitional Policy was a "substantial factor motivating" the rate increase Blue Cross discusses in that rate filing, Appellants have not linked that rate increase to their own alleged injury.

To circumvent the holes in their causation theory, Appellants rely principally on our decision in *Center for Auto Safety v. NHTSA*, 793 F.2d 1322 (D.C. Cir. 1986). That case involved the Corporate Average Fuel Economy ("CAFE") standards set by the National Highway Traffic Safety Administration ("NHTSA"), which determine how fuel efficient an overall fleet of vehicles must be. The Center for Auto Safety challenged NHTSA's 1985 CAFE standard, which allowed light trucks to be 1.5 miles per gallon less fuel

efficient than its previous standard. *See id.* at 1323. Assessing whether the Center had standing to bring its suit, we considered whether its alleged injury – its members' inability to buy more fuel-efficient trucks, *see id.* at 1324 – was caused by NHTSA's new CAFE standard. We found "no difficulty in linking the petitioners' injury to the challenged agency action," *id.* at 1334, stating that "the agency's regulation and the injury are . . . directly linked" because "NHTSA sets standards for the purpose of making vehicles more fuel-efficient," and "petitioners, in turn, complain of less fuel-efficient vehicles." *Id.* We explained that "[i]f setting a higher standard cannot result in vehicles with increased fuel efficiency, then the entire regulatory scheme is pointless." *Id.* at 1334-35. We also noted that the case "involves none of the multiple, tenuous links between challenged conduct and asserted injury that have characterized claims in which causation has been found lacking." *Id.* at 1335.

Based on their reading of *Center for Auto Safety*, Appellants argue that "increasing health insurance coverage and the size of purchasing pools" is "pointless" if it does not bring down health care costs. Appellants' Br. 36 (emphasis omitted). Accordingly, they contend that there must be a direct link between HHS's Transitional Policy, which allegedly decreased the size of those purchasing pools, and the increase in Appellants' premiums. The instant case, however, is easily distinguished from *Center for Auto Safety*. There, NHTSA set a specific floor auto manufacturers were required to follow. Thus, if NHTSA determined that a truck fleet had to meet, on average, a 20-miles-per-gallon fuel efficiency rating, the average fuel efficiency of a manufacturer's truck fleet could not fall below 20 miles per gallon. There were also no outside factors that could interact with fuel efficiency standards to alter that floor.

The instant case is different. First, although one of Congress's goals in drafting the ACA was to decrease the cost of health care, *Nat'l Fed'n of Indep. Bus.*, 132 S. Ct. at 2580, the ACA establishes no floor under which health care prices cannot drop, nor a ceiling above which prices cannot rise. Second, many factors determine the cost of health care, including administrative costs, drug costs, and the health and age of the national populace. *See generally* BIPARTISAN POLICY CTR., WHAT IS DRIVING U.S. HEALTH CARE SPENDING? AMERICA'S UNSUSTAINABLE HEALTH CARE COST GROWTH (September 2012), http://bipartisanpolicy.org/library/what-driving-us-health-care-spending-americas-unsustainable-health-care-cost-growth/ (providing a "basic overview of the drivers of health care cost growth," and noting that such drivers are "complex and overlapping"). Changes in any of these factors could cause costs to increase or decrease, and it is difficult to separate out which factors actually cause any specific price adjustment. Unlike *Center for Auto Safety*, where the Center established a direct link between NHTSA's CAFE standards and the fuel efficiency of vehicles, Appellants have made no attempt to separate out any of these factors. As a result, they have not established a sufficient link between the size of the risk pools at issue here and the cost of their health care.

Accordingly, Appellants have failed to demonstrate that HHS's Transitional Policy caused the alleged increase in their health insurance policy's price; they lack standing to challenge the Transitional Policy on that ground.

## C.

"The 'injury in fact' element of standing in . . . an equal protection case is the denial of equal treatment resulting from the imposition of the barrier . . . ." *Ne. Fla. Chapter of*

*Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993).  Appellants' second standing argument is that HHS discriminated against Muise when it "unlawfully exempted some 'applicable individuals' (and their plans) . . . from the Individual Mandate," but not him. Appellants' Br. 42-43.  Although Appellants evidently intend to contend that HHS has denied Muise equal treatment with respect to the Hardship Exemption, Muise cannot demonstrate injury in that regard:  Muise is insured and thus is not subject to the penalty in the first place (such that the exemption would be of no benefit to him).

Appellants also evidently raise an equal protection challenge with regard to the Transitional Policy.  They contend that because only some individuals were able to benefit from the Transitional Policy (namely, those individuals whose plan is issued by a health insurance company that took advantage of the Policy), HHS applied its policy discriminatorily.  Our precedent directly refutes this claim.

In *Cutler v. HHS*, a plaintiff whose health insurance plan was cancelled by his health insurance company because the plan was not ACA-compliant brought suit challenging HHS's Transitional Policy.  797 F.3d at 1175.  Among other things, plaintiff challenged the Policy as depriving him of equal protection of the law.  *Id.* at 1183.  We held that he lacked standing to bring his challenge:

> Cutler lacks Article III standing to pursue his equal protection challenge because his alleged injury is not fairly traceable to the transitional policy, nor would it be redressed by striking down that policy.  The transitional policy applies evenhandedly across the United States,

> so if Cutler cannot obtain the insurance he desires and others can, that is because his own insurer cancelled his policy. Cutler's injury is thus the result of the action of his private insurer, not the transitional policy, and it is purely speculative whether an order in this case would alter or affect the non-party insurers' decision.

*Id.* at 1183-84.

*Cutler* is directly on point here. Appellants' inability to benefit from the Transitional Policy stems not from the actions of HHS, which applied the Policy "evenhandedly," but from Blue Cross's decision to discontinue Appellants' policy. Thus, for the same reasons established in *Cutler*, Appellants' "alleged injury is not fairly traceable to the transitional policy, nor would it be redressed by striking down that policy." *Id.* at 1183.

Appellants therefore lack standing to challenge the Transitional Policy on equal protection grounds.

\*\*\*

For the foregoing reasons, we affirm the District Court's judgment.

*So ordered.*